YAZOO & M. V. R. Co. *v.* SIDEBOARD.

(Division B. April 20, 1931.)

[133 So. 669. No. 28855.]

Hirsh, Dent & Landau, of Vicksburg, and **Chas. N. Burch, H. D. Minor** and **C. H. McKay**, of Memphis, Tenn., for appellant.

T. G. Ewing, of Memphis, Tenn., and **W. W. Ramsey, Thames & Thames** and **Brunini & Hirsch,** all of Vicksburg, for appellee.

**Griffith, J.,** delivered the opinion of the court.

Appellee, a colored man, entered in the employment of appellant railroad as a freight train brakeman on October 1, 1910. After four years in that capacity, he was transferred to the passenger service, where continuously from 1914 to March 14, 1928, he performed the joint duties of porter and brakeman on passenger trains from Vicksburg to New Orleans and return.

During the period of federal control there was issued by the director general of railroads the following order, effective as of June 1, 1918:

"1. Employees in a passenger train crew, except conductor, collector and baggagemaster, qualified and regularly required to perform the following essential duties, will be designated as passenger brakemen or flagmen, and paid accordingly:

"(a) Inspect cars and test signal and brake apparatus for the safety of train movement.

"(b) Use hand and lamp signals for the protection and movement of trains.

"(c) Open and close switches.

"(d) Couple and uncouple cars and engines and the hose and chain attachments thereof.

"(e) Compare watches when required by rule.

"2. Where white brakemen are not employed, the compensation and overtime rule for colored brakemen shall be the same, for both passenger and freight service, as for the same positions in the minimum paid contiguous road.

"3. This order shall not curtail the duties of employees heretofore classed as 'train porters.'

"4. This order shall not infringe upon the seniority rights of white trainmen."

After the termination of federal control on March 1, 1920, the railroad and the Brotherhood of Railroad Trainmen, a labor union composed exclusively of white men, made a trainmen's working and compensation agreement, which contained as a part thereof the language above quoted; and thereafter, on April 28, 1924, the said union and the railroad made another agreement, which agreement still remains in force, and in which the said above-quoted language was inserted in full and without change, and there was included therein also the following provisions:

"Rights contained in this agreement shall be understood to apply for both white and colored employees alike. . . .

"Road trainmen performing more than one class of road service in a day or trip will be paid for the entire service at the highest rate applicable to any class of service performed.

"No passenger train porter is to have any trainman's rights except where he may have established same by three months' work continuously in freight train service."

From the date of the promulgation of the federal order above quoted, and which, as stated, was inserted in full in the subsequent trainmen's contracts with the railroad company, appellee was regularly required to perform, and did perform, the essential duties of a brake-

man as mentioned therein, and was at all times designated as a brakeman, and was paid brakeman's wages, and was repeatedly adjudged as qualified so to do by regular examinations passed by him, and this designation of, and rate of pay to, appellee as brakeman was continued by the railroad down to the date next mentioned. But on February 27, 1925, appellant, having conceived at that time the idea that, because appellee was not, and could not be, a member of the trainmen's union, he could not enforce any rights under the said trainmen's contract, notified appellee that on and after March 16, 1925, he would no longer be paid as a brakeman, but would be paid the lesser wages of ninety dollars per month as a porter. Appellant continued in the service, and was thereafter regularly required to perform the joint service of brakeman and porter as theretofore. Checks were thereafter regularly sent him for his compensation at the new rate, which checks carried on their faces the stipulation that they were ''in full for services rendered.'' These checks were accepted and cashed by appellee from March 16, 1925, down to March 1, 1927; during all of which time, however, appellee and other train porters were appealing for a recognition of their rights to brakemen's pay, by letter and by personal interviews from officer to officer of the railroad company on up by successive steps finally to the president of the entire railroad system. These appeals were met with a consistent and persistent refusal, and finally, when he saw that there was no possibility of any change of attitude on the part of the railroad company, appellee on and after March 1, 1927, declined to accept or cash any further of the tendered pay checks, and, after the matter had thus gone on for an additional year, and the railroad saw that there was no probability of a change of attitude on appellee's part in respect to this matter of pay, the railroad, on March 14, 1928, discharged appellee from its service.

The quoted terms of the said union contract, as well as some further provisions which bear upon them, would not have been quite clear to us except for the fact that (1) in all respects substantially material to a decision here the parties in their several briefs have come fairly well into general accord as to the meaning of those terms, in point of fact, and (2) there was a practical construction placed by the parties on this contract in accordance with the contention of appellee for nearly a year after the last contract was made, to say nothing of the previous contract or contracts said to have contained similar terms; which practical construction we are well justified in adopting here, especially in view of the consideration that the said construction appears to be the more consonant with the terms used, and as the parties now agree in general was in point of fact meant by said terms.

The decisive questions then are whether appellee may avail of said union contract, and if so, whether he is foreclosed in respect to that part of the compensation accepted by him antedating March 1, 1927. The several other collateral points raised and discussed have been examined, and as to them we say only that in our opinion they are not maintained under the modern authorities on those questions.

From the time two hundred years ago, when in England labor unions were held to be criminal conspiracies, on down even to a recent period, the struggles of these unions for full recognition in the law upon a favorable basis has been somewhat arduous and beset with obstacles. The time has at last arrived, however, when, under patriotic and intelligent leadership, their place has become secure in the confidence of the country, and their contracts are no longer construed with hesitancy or strictness, but are accorded the same liberality, and receive the same benefits of the application of the principles of the modern law, bestowed upon other agreements which appertain to the important affairs of life. So that, although only a few years ago the courts were

14

holding that an individual member of a labor union could not maintain an action for the breach of an agreement between an employer and the union of which the plaintiff was a member in respect to wages and other rights fixed in the contract, Hudson v. Cincinnati, etc., R. Co., 152 Ky. 711, 154 S. W. 47, 45 L. R. A. (N. S.) 184, Ann. Cas. 1915B, 98; West v. Baltimore & O. R. Co., 103 W. Va. 417, 137 S. E. 654; Burnetta v. Marceline Coal Co., 180 Mo. 241, 79 S. W. 136, these rulings have been left in the rear in the advancement of the law on this general subject, and the holdings now are that these agreements are primarily for the individual benefit of the members of the organization, and that the rights secured by these contracts are the individual rights of the individual members of the union, and may be enforced directly by the individual. Piercy v. Louisville & N. Ry. Co., 198 Ky. 477, 248 S. W. 1042, 33 A. L. R. 322; Gulla v. Barton, 164 App. Div. 293, 149 N. Y. S. 952; Blum & Co. v. Landau, 23 Ohio App. 426, 155 N. E. 154; Cross Mountain Coal Co. v. Ault, 157 Tenn. 461, 9 S. W. (2d) 692.

But the case here before us involves, as would seem apparent, a still further step, and that is whether appellee who is not a member of the union which made the contract, but who has performed in accordance therewith, can rely upon and sue for its benefits; in other words, is he, as a third person, such a stranger to it that he can have no enforceable rights under it? That a third party may recover directly on a contract made expressly for his benefit is not an open question in this state. Canada v. Yazoo & M. V. R. Co., 101 Miss. 274, 57 So. 913. The difficulty is to determine when a particular case comes within the rule. There are hundreds of cases on this subject, as may be seen from the notes 13 C. J., pp. 703-711; 6 R. C. L., pp. 882-890; 2 Elliott on Contracts, section 1412 et seq. Taking the leading among those cases, as, for instance, Smyth v. City of New York,

203 N. Y. 106, 96 N. E. 409, and searching through them for a more definite or a more tangible statement of the rule, we think it will be found that the best considered of these cases reason the matter down to this: (1) When the terms of the contract are expressly broad enough to include the third party either by name as one of a specified class, and (2) the said third party was evidently within the intent of the terms so used, the said third party will be within its benefits, if (3) the promisee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract. It seems to us that this is a conservatively sound statement of the rule as applicable to this case and that the case comes within it.

But the position of appellee is yet stronger than that, as it would appear here. Not only did the members of this white trainmen's union have a substantial and articulate interest in the experienced and competent colored employees who were performing the duties of trainmen on the same trains with these white union members, working side by side in the dangerous business of the operation of these trains, but there was an interest far beyond that. For, if a colored man, or a non-union man, white or black, could be required to perform a brakeman's duties, and because called a porter he could be paid less wages than a brakeman, then, upon like procedure, the flagmen's positions or that of baggagemen could be gradually filled by nonunion men, and, by calling them chief porter and flagman, or porter and baggageman, they, too, could be paid only porters' wages; so that these places could be finally supplied by nonunion men, and paid less wages, and gradually thereby union men would disappear, not only from these, but from all other trainmen's positions. That such a result was never for a moment contemplated by this union contract, but, on the other hand, was intended to be guarded against, would hardly be open to discussion.

And how was this to be safely guarded against? Since there are no terms in the contract limiting the railroad to the employment of union men, the answer is plain that the security of union men in their positions was to be guarded by the very provisions in respect to pay which were so carefully inserted, namely, that whenever an employee on one of these trains regularly performed the duties of a higher station, he was to be paid the rate of wages applicable to that higher station, regardless of the nominal designation given that employee, and that this should apply whether the employee be white or black, union or nonunion. The rate of pay is the radial, the hub that holds the several spokes in place. With the rate of pay thus fixed and secured to all employees on the train, the inducement, and the only inducement, that would exist to let out union members and let in nonunion men, would disappear. Thus the interest of the union members in respect to the rate of pay was substantially tied into or united with that of nonunion men, including colored train employees; and the contract results in this manner to and for the benefit of all of them so far as the rates of pay were concerned; and, being so, appellant as a third party in interest could accept and rely on its benefits in respect to the rate of pay and sue for the same. The remedy is as broad as the contractual rights. 2 Elliott, Contracts, sec. 1411.

We are of the opinion, therefore, that the learned trial judge was correct in his peremptory instruction in favor of appellee for the wages due him as brakeman from March 1, 1927, to March 14, 1928. We think, however, that as to the pay prior to March 1, 1927, the acceptance by appellee of the pay checks for that period precludes his recovery of the difference which would otherwise be due him, because the checks expressly stated that they were in full for services rendered; appellee knew, or should have known, under the facts disclosed by this record, that they were tendered in full, and knew

that appellant was persistently contending that it owed no more. So often has it been held in this state that such a tender and acceptance is an accord and satisfaction, and so long has this question been thought to be settled in this jurisdiction, that we cannot now disturb the rule or enter upon refined distinctions which would tend to reopen the debate on that subject, unless the case presented some such peculiar feature, and of such compelling appeal to justice, as would make a distinction absolutely unavoidable—which is not the case here. Some of our several decisions on this subject are: Clayton v. Clark, 74 Miss. 499, 21 So. 565, 22 So. 189, 37 L. R. A. 771, 60 Am. St. Rep. 521; Darrill v. Dodds, 78 Miss. 912, 30 So. 4; Cooper v. Railroad Co., 82 Miss. 634, 35 So. 162; Greener & Sons v. P. W. Cain & Sons, 137 Miss. 35, 101 So. 859; May Bros. v. Doggett, 155 Miss. 849, 124 So. 476; Phillips v. Ins. Co., 156 Miss. 41, 125 So. 705. The judgment will be affirmed in part, and in part reversed, and the case will be remanded in order that the proper calculations may be made and final judgment entered in the circuit court in accordance with the views herein expressed.

Affirmed in part, and in part reversed and remanded.