## YAZOO & M. V. R. CO. v. WEBB.
### No. 6604.

Circuit Court of Appeals, Fifth Circuit.
April 22, 1933.

R. L. Dent, of Vicksburg, Miss., and Charles N. Burch, of Memphis, Tenn., for appellant.

John B. Brunini, T. G. Ewing, and James D. Thames, all of Vicksburg, Miss., for appellee.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

Upon a bill for discovery and accounting Epsie Webb obtained a decree against Yazoo & Mississippi Valley Railroad Company for a balance claimed to be due him as wages under a written contract between that company and the Brotherhood of Railway Trainmen, of which organization he was not a member. The railroad company appeals, insisting mainly that Webb was no party to and not a beneficiary of the contract; that his employment was as a train porter and not covered by the contract, and that by the acceptance and collection each fortnight during the six years in dispute of a pay check expressed to be "in full for services rendered" there had been a full settlement and payment.

Webb, a colored man, had worked for the railroad company for many years, first as a freight train brakeman and afterwards on the passenger train as a porter, but also assisting in duties which were usually performed on passenger trains by the flagman and baggageman, such as giving signals, changing switches, assisting in testing airbrakes, and helping with baggage and express. He wore a uniform bought by himself, his cap displaying the word porter. During federal control of the railroad and afterwards until March, 1925, he was paid the same wages as a flagman. The evidence shows that a train porter is not required to stand examination on the transportation rules, but only a physical one; that he has no authority or responsibility, but acts under and on orders of the train conductor, but may by him be required to do any of the things which a flagman under the transportation rules does on his own judgment and initiative. The contract involved is headed:

"The Yazoo & Mississippi Valley Railroad Company. Schedule of Wages and Rules for Trainmen. Effective April 28, 1924," and concludes: "This agreement shall remain in effect until Dec. 31, 1925, and thereafter until revised or abrogated, of which intention thirty days written notice shall be given. J. J. Pelley, General Manager. Accepted for Brotherhood of Railway Trainmen. R. T. McNulty, General Chairman. H. T. Stafford, General Secretary." It was still in force in 1931. Engineers, firemen, and conductors no doubt had their separate agreements. Porters are shown to have an organization, but no agreement or contract with this railroad. In March, 1925, the trainmaster notified Webb in person that beginning April 1st his pay would be $90 per month, which was about one-half that fixed by the contract for flagmen and which he had been receiving, and instructed him to see the conductor, who would tell him what his duties were. The conductor told him to do as he had been doing. This he did, not only cleaning the cars and assisting colored passengers as a porter usually does, but also helping with train signals, brake tests, changing switches, and coupling cars as previously. There were in his train crew a regular flagman and baggageman. His pay checks came each two weeks on a basis of $90 per month, reading: "In full for services rendered." He protested to the paymaster on receipt of the first two, but indorsed and collected them. He and other porters sought redress from the superintendent, from the general manager, and from the president of the railroad. Each of these by letter or verbally told them that they were classed as porters and nothing would be done further. No one at any time led Webb to think otherwise. Efforts to get more pay ceased in 1928. There is little conflict in the evidence as to what Webb actually did, but he claims he did it on his own initiative and judgment, while the conductor testifies it was under his instructions. Webb produces a certificate dated April 21, 1923, that he had been examined on the rules and regulations of the transportation department, and was qualified to fill the position of train porter. On May 21, 1923, he signed an application for physical examination, stating his present occupation to be train porter, and was passed. He had a watch inspection certificate dated April 9, 1923, which named him a porter. He presented no later certificates. His train passes for the years 1925, 1926, 1927, and 1928 were issued to him as porter, but those for 1929, 1930, and 1931 named him brakeman. All were issued on his applications. His time re-

ports made by the conductor and the company's timesheets all showed him as a porter. Webb was laid off in February, 1931, and brought this bill on August 19, 1931. A fellow employee sued on similar facts in the state court. It was held that he might sue under the trainmen's contract though not a member of the brotherhood, but that for such periods of service as he accepted his pay checks he could recover nothing additional. Yazoo & Mississippi Valley R. R. Company v. Sideboard, 161 Miss. 4, 133 So. 669.

We reject the contention that if Webb be under the wage agreement with the Brotherhood of Trainmen that it was abrogated as to him by its own terms thirty days after notice that his wages were changed. The provision for abrogation involves the agreement as a whole and not its application to the wages of some one employee. The agreement aims at uniformity of treatment and cannot be dissipated by piecemeal. The notice contemplated by it is one in writing and posted in the bulletin board for the information of all, or at least one given to the brotherhood which signed the agreement. Webb's rights are not to be disposed of on the basis of an abrogation of the wage agreement.

An agreement upon wages and working conditions between the managers of an industry and its employees, whether made in an atmosphere of peace or under the stress of strike or lockout resembles in many ways a treaty. As a safeguard of social peace it ought to be construed not narrowly and technically but broadly and so as to accomplish its evident aims and ought on both sides to be kept faithfully and without subterfuge. In no other way can confidence and industrial harmony be sustained. But in itself it can rarely be a subject of court action because it is incomplete. It establishes no concrete contract between the employer and any employee. No one is bound thereby to serve, and the employer is not bound to hire any particular person. It is only an agreement as to the terms on which contracts of employment may be satisfactorily made and carried out. It is a mutual general offer to be closed by specific acceptances. When negotiated by representatives of an organization it is called collective bargaining, but ordinarily the laws of the organization, which constitute the authority of the representatives to act, do not require the individual members to serve under it, but only that if they serve they will do so under its terms and will join in maintaining them as applied to others. When the agreement is published by the managers, it becomes

until abrogated the rule of that industry and any individual who thereafter continues in its employment or takes new employment takes it on the terms thereby fixed. Ordinarily, as in this case, there is no period fixed for the hirings and they are at the will of the parties, the employer having the right to discharge at any time and the employee having the right to quit. But the employment though indefinite as to time is a relationship while it lasts, and is subject to the conditions fixed in the working agreement for the industry. Thus a worker cannot be discharged for causes prohibited by the agreement or without a hearing if that is provided, and the agreed seniorities must be observed in promoting, laying off, or re-employing men. This is plain as to all members who were represented in making the agreement, but it is said that nonmembers because they have not authorized its making are not bound, and consequently have no protection under it. In the mere making of the agreement this is true, but when it is not by its terms confined to members but purports to cover all employees in the industry of the classes dealt with and is thus published by the employer, nonmembers who continue in the employment or who afterwards enter it accept and adopt the agreement, and are through the adoption as fully bound and protected by it as is any one else. When, however, the agreement purports to be .limited to certain classes of employees, it has no application to employees of another class unless it be specially adopted in hiring them. When, therefore, an employee brings into court a case concerning his individual rights under such an agreement a question may be raised whether his employment comes under it. The views of other courts; in the main concordant with these expressions, may be found in Yazoo & Miss. Valley R. R. Co. v. Sideboard, 161 Miss. 4, 133 So. 669; Cross Mountain Coal Co. v. Ault, 157 Tenn. 461, 9 S.W.(2d) 692; St. Louis, etc., Co. v. Booker (Tex. Civ. App.) 5 S.W.(2d) 856; West v. B. & O. R. R. Co., 103 W. Va. 417, 137 S. E. 654; Piercy v. L. & N. R. R. Co., 198 Ky. 477, 248 S. W. 1042, 33 A. L. R. 322; Hudson v. C., N. O. & T. P. Ry. Co., 152 Ky. 711, 154 S. W. 47, 45 L. R. A. (N. S.) 184; Burnetta v. Marceline Coal Co., 180 Mo. 241, 79 S. W. 136.

█ The agreement here in question is orderly divided. Section 1, headed Passenger Service, fixes pay and conditions of service of baggagemen and flagmen only, but refers frequently to trainmen. Porters are not mentioned. Section 2, headed Freight Service, fixes pay for flagmen and brakemen only, and refers generally to conditions of service of trainmen. It is proven that there are no porters in that service. Article 5 of this section providing: "Road trainmen performing more than one class of road service in a day or trip will be paid for the entire service at the highest rate applicable to any class of service performed," refers only to freight trainmen and can have no application to a passenger train porter. Section 3, headed Miscellaneous, contains among other things Supplement 12 to General Order 27 originally promulgated by the Director General of Railroads during federal control, which alone mentions porters. The agreement nowhere refers to members or nonmembers of the signing Brotherhood of Railway Trainmen, whose membership includes neither porters nor colored persons. There are several provisions indicating that no differences are to be made between white and colored trainmen. We have no doubt that the agreement by its terms covers all trainmen on the railroad of the classes dealt with, to wit, baggagemen and flagmen in passenger service and brakemen and flagmen in freight service, whether white or colored, union or nonunion, but that porters are not trainmen within its meaning nor covered unless under Supplement 12. The position of a porter is affected by three of the supplement's provisions: "1. Employees in a passenger train crew, except conductor, collector and baggageman, qualified and regularly required to perform the following essential duties will be designated as passenger brakeman or flagman, and paid accordingly." The duties referred to all relate to train safety and include train inspection, signals, turning switches, coupling cars, and comparison of watches, things usually performed by the flagman or passenger brakeman. The evident purpose here is to prevent the degradation of a qualified trainman to a porter's or other employee's place, while regularly requiring of him a trainman's work and responsibility. If such service is regularly required of such a man, his rank and pay are to be fixed by that service. "3. This order shall not curtail the duties of employees heretofore classed as train porters." Again a porter is referred to not as a trainman but as an employee. His duties, though nowhere defined in the agreement, are concededly to do whatever the conductor requires about the train but under the conductor's supervision and on his responsibility, the knowledge and judgment of a trainman not being required of a porter. Where the crew already contains its regular trainmen, this provision would not preclude a qualified trainman from taking a porter's

job at porter's pay if such was the real agreement with him. "4. (g). No passenger train porter is to have any trainman's rights except where he may have established same by three months' work continuously in freight service." Again a train porter is not counted among but contrasted with trainmen. The agreement here is that the porter shall not have a trainman's rights unless he has had trainman's experience as stated.

Applying all this to Webb, he is not excluded by being a colored or a nonunion man. The generality of the agreement published as the rule of the railroad enables him to adopt it by his continued employment so far as his employment comes under it. He had three months' work in freight service, and according to his testimony, though he shows no such certificate, he had had a brakeman's examination and was regularly required on the passenger train to do flagman's or brakeman's work in addition to things ordinarily required only of porters, and on his own initiative and judgment. By his testimony he might come under Supplement 12, 1. The company's witnesses, however, say that when put on the passenger train he was employed only as a porter, examined as such, clothed and given passes, and carried on the company's records as such, and while before March, 1925, he was paid as a brakeman and might have been entitled to such pay under Supplement 12, that after that date he was made only a porter, put under the conductor as such, and on porter's pay then fixed, and was no longer required to do flagman's work on his own judgment, there being always a regular flagman in the crew; all of which he well understood, and though at first protesting he at last agreed to. If this is true, his right to flagman's pay was certainly disputable under all the provisions of Supplement 12. And being fairly disputable, we need not decide the dispute, because of what happened next.

▮▮ Webb was notified that his pay would be on a basis of $90, and to report to the conductor for his orders. While he disputed the company's right to cut his pay and make a mere porter of him, he did not misunderstand the intention. He admits that then and at all times he understood that the company was treating him as a porter without right to flagman's pay. When his first reduced pay check was given him, stating as always that it was in full for services rendered, he did not overlook that condition of the payment or fail to appreciate that his claim of right to more pay was disputed. After protesting,

he accepted and indorsed it instead of rejecting it and suing for his rights as he claimed them to be. After the second check there was no longer a protest, but an intermittent agitation for recognition of the rights he claimed under Supplement 12 was kept up for three years with absolutely no encouragement to think it would be recognized. One hundred and thirty-nine checks were thus cashed, half of them after all agitation had ceased. One cannot keep money offered as in full settlement of a disputed claim and reject the condition on which it is offered. The contention that the checks were paid for the porter's work but not for the flagman's is not sound. There was but a single employment and one wage due. Its measure was in dispute. "The rule is well established that where the facts show clearly a certain sum to be due from one person to another, a release of the entire sum upon payment of a part is without consideration, and the creditor may still sue and recover the residue. If there be a bona fide dispute as to the amount due, such dispute may be the subject of a compromise and payment of a certain sum as a satisfaction of the entire claim, but where the larger sum is admitted to be due, or the circumstances of the case show that there was no good reason to doubt that it was due, the release of the whole upon payment of part will not be considered as a compromise, but will be treated as without consideration and void." Chicago, Milwaukee, etc., Ry. v. Clark, 178 U. S. at page 367, 20 S. Ct. 924, 929, 44 L. Ed. 1099. We think the true amount due Webb was fairly disputable, and was in dispute, and that the deliberate and intentional acceptance and indorsement by him of the checks was a settlement each fortnight of the amount due for the fortnight. Y. & M. V. R. R. v. Sideboard, 161 Miss. 4, 133 So. 669; Nassoiy v. Tomlinson, 148 N. Y. 326, 42 N. E. 715, 51 Am. St. Rep. 695; United States Bobbin, etc., Co. v. Thissell (C. C. A.) 137 F. 1; Samuels v. E. F. Drew & Co. (D. C.) 7 F.(2d) 764, affirmed (C. C. A.) 7 F.(2d) 766; Schwartzenberg v. Mayerson (C. C. A.) 2 F.(2d) 327; 1 R. C. L., Accord and Satisfaction, §§ 31, 32, 33. Dick v. Davis, 53 App. D. C. 91, 288 F. 445, 449, is to be distinguished not only because Supplement 12 no longer has the force of law as an order of the Director General and is a mere term of an agreement, but especially because in that case the court thought there was not evidence to show a dispute touching the pay. The judgment is reversed, and the case remanded with direction to dismiss the bill.