OTIS *v.* GULF & SHIP ISLAND R. CO.

(In Banc.    Sept. 25, 1944.)

[19 So. (2d) 241.    No. 35658.]

**Jackson, Young & Phillips,** of Jackson, for appellant.

58

May & Byrd, of Jackson, **Vernon W. Foster** and **Chas. A. Helsell**, both of Chicago, Ill., for appellee.

**Roberds, J.,** delivered the opinion of the court.

The question we decide in this case is whether appellant, Otis, plaintiff below, by the allegations of his declaration, brought himself within the provisions of an agreement between the Brotherhood of Railroad Trainmen, a labor organization of white men, and the appellee

railroad, effective October 6, 1925. The question arose under demurrer and the trial judge decided it adversely to appellant. Both parties have also asked that we pass upon it on this appeal.

The basis of Otis' claim was his discharge as an employee of appellee railroad on October 10, 1933, which discharge, he says, was without just cause and in violation of the above agreement. His declaration contains this averment: "That on October 10th, 1933, and for a long time prior thereto, plaintiff was and had been employed by said railroad corporation in the capacity of a train porter, but during said period of employment the plaintiff had been required to perform and did perform in addition to his duties as train porter, the duties required of and commonly designated as a trainman."

He alleges that the foregoing agreement was in effect during the period of his employment, making it an exhibit to the declaration.

He then says:

"That although the plaintiff was not a member of said labor organization during his employment by the defendant, he performed the duties of a trainman, and, accordingly, became entitled to rely upon said contract and to the benefits thereof."

"That notwithstand the provision of said contract that the plaintiff, who by virtue of his employment was entitled to receive the benefits, should not be discharged without just cause, the defendant did on or about the 10th day of October, 1933, without just cause, arbitrarily discharge the plaintiff from its employment, and has since said date refused to retain or employ the plaintiff in its service, and although said plaintiff has diligently sought employment since said time, he has been unable to obtain any regular employment."

Having thus attempted to bring himself within the provisions of said union contract, he invokes especially the benefits of the following clause thereof: "(a) Trainmen or yardmen will not be demerited, suspended or dis-

charged without just cause. When demerited, suspended or discharged they will be notified in writing the cause of such action and will be given a hearing within ten (10) days, provided written request is made on proper officer for such investigation, and will be notified result of investigation within ten (10) days thereafter. Ten days after notification of result of investigation will be allowed for the filing of an appeal to higher officials. If charges are not sustained the accused will be returned to the service and paid full time for all time lòst. At investigations above described the accused will be privileged to call upon a fellow trainman of his own choosing to represent and speak for him.''

The declaration also contains this statement: ''That at the time of his wrongful discharge, as above set forth, and for a long time prior thereto, plaintiff was receiving from the defendant by virtue of his employment the sum of $90.00 per month. That a period of approximately six years has elapsed since the date of plaintiff's wrongful discharge by the defendant, and although plaintiff has diligently sought employment . . . . .'' The total amount for which suit was brought is $16,500, of which $6,500 is for lost wages and $10,000 is for ''said wrongful discharge and breach of contract by the defendant.''

The said labor agreement defines its members in these words: ''The word 'trainmen' referred to in these rules applies to Brakemen, Baggagemen and Flagmen; 'yardmen' applies to Foremen and Helpers.''

It sets out the monthly wages of those in the several classes, the lowest wage being more than $90 per month.

It contains many provisions controlling the hours of work, regular and overtime pay, size of crews, seniority and transportation rights, the order of promotion, grievances and complaints,—in fact, detailed and comprehensive rules and schedules regulating the services, duties and rights of its members both between themselves and between them and the railroad.

It is then stipulated in Article 38 (k) that: "White men are not to be used as porters nor porters to have any trainmen's rights."

Appellant is a negro man. Does the declaration bring him within the provisions of the foregoing union contract? We think not.

The declaration states expressly that Otis was employed during the entire time as a porter and he sues for a porter's wages. It is not stated how long he worked as a trainman, nor whether as a brakeman, baggageman, flagman, yard foreman and helper. What he did is not set out. The declaration is vague and indefinite as to what he did as a trainman. Doubtful and uncertain allegations therein will be construed against the pleader. It is a fair conclusion from its averments that whatever acts were performed by Otis other than as porter were incidental. The labor agreement states concisely and positively that porters are not to have any trainmen's rights.

Appellant relies mainly upon the case of Yazoo & M. V. R. Company v. Sideboard, 161 Miss. 4, 133 So. 669, 670. That case is distinguishable from the case at bar in many vital respects. Sideboard worked as a brakeman from 1910 to 1914, and from 1914 to 1928 he performed the duties of porter and brakeman on a passenger train. He "was regularly required to perform, and did perform, the essential duties of a brakeman . . . and was at all times designated as a brakeman, and was paid brakeman's wages . . . " to February 27, 1925, when the railroad notified him he would thereafter be paid not the wages of a brakeman but the lesser wages of a porter. The court held that he was entitled to the wages of a brakeman. The holding was grounded upon these rights:

From June 1, 1918, to March 1, 1920, the railroads were being operated by the Federal Government under rules and regulations promulgated by the Government. One section of such rules provided that where colored brake-

men were employed, both for passenger and freight service, the wages should be the same as those of white brakemen.

After the termination of Federal control on March 1, 1920, the Brotherhood of Railroad Trainmen executed a new agreement with the railroad, which contained as a part thereof the foregoing provision of the Federal rules, and on April 28, 1924, the union and the railroad entered into a new contract, which contained the above provision and which also provided: "Rights contained in this agreement shall be understood to apply for both white and colored employees alike . . . Road trainmen performing more than one class of road service in a day or trip will be paid for the entire service at the highest rate applicable to any class of service performed."

It will thus be seen that in that case Sideboard was recognized and treated as a trainman, and he sued for his wages as a trainman, which might be grounded, in the absence of a contract, upon a quantum meruit basis, and the union contract expressly provided that the rights thereunder applied both to white and colored employees alike; whereas, in the case at bar, Otis does not sue for wages as a trainman; it is not asserted that he had the status of a trainman, but the declaration states that at all times he was employed as a porter, and the very contract he invokes expressly denies to him the right he tries to assert. He does not state that he had a contract for a definite period and was wrongfully discharged before its expiration. His right rests solely and alone upon the union contract, and it expressly denies him any rights thereunder. Incidentally, though no point is made upon it, Otis does not claim that he made any request for a hearing under the clause of the union contract which he invokes. The lower court was correct in holding that the declaration states no cause of action. The plaintiff declined to further plead. The case is therefore affirmed.

Affirmed.