McQUEEN CONTRACTING, INC., Plaintiff–Appellee Cross–Appellant,

v.

FIDELITY & DEPOSIT COMPANY OF MARYLAND, Defendant–Appellant Cross–Appellee.

No. 87–4871.

United States Court of Appeals, Fifth Circuit.

Jan. 26, 1989.

trak's treatment of him, it would have been logical to pursue it through an Amtrak investigator.

David W. Mockbee, Walker W. Jones, III, Eugene R. Preaus, Phelps, Dunbar, Marks, Claverie & Sims, Jackson, Miss., for defendant-appellant-cross-appellee.

Robert C. Williamson, Jr., Luther S. Ott, Jackson, Miss., for plaintiff-appellee-cross-appellant.

Before THORNBERRY, RUBIN, and HIGGINBOTHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

This diversity case involves several questions of Mississippi law. The primary issue is whether a subcontractor is entitled to recover under a performance bond in addition to recovering under a separate, simultaneously executed payment bond. We hold that recovery is limited to the terms of the payment bond and, in doing so, reverse the district court's ruling on this issue and affirm the judgment in all other respects.

## I.

This appeal arises from the development of the Westwick Apartment project in Biloxi, Mississippi in the latter part of 1982 and 1983. Hobbit Hill, Ltd. (Hobbit Hill), the owner and developer of the project, originally engaged Sage Construction Co. (Sage) to serve as the project's general contractor. In turn, Sage subcontracted with appellee/cross-appellant McQueen Contracting, Inc. (McQueen) to prepare the site for the erection of the apartment complex. Site preparation included construction of streets, sewer lines, water mains, and storm drainage systems as well as removal of an "unstable mixture of decaying organic matter, sand, and water" known as "muck" to provide a secure foundation on which to erect the apartment complex.

To receive the City of Biloxi's permission to develop the project, the Biloxi Municipal Code required Hobbit Hill to agree to construct and, upon completion, dedicate to the City certain site improvements, namely the streets and utilities. The trial court found that Hobbit Hill's agreement to dedicate these site improvements in exchange for the City's permission to construct the complex constituted a contract between Hobbit Hill and the City of Biloxi. The Biloxi Code also provided that, unless Hobbit Hill obtained a performance bond guaranteeing

completion of this contract, construction of the apartment complex could not begin until after the improvements had been completed and accepted by the City. To enable it to commence erecting the buildings before the improvements were completed, Hobbit Hill contacted Fidelity & Deposit Company of Maryland (F & D), the appellant herein, to obtain a performance bond naming the City of Biloxi as obligee.

Although a single performance bond would have met the requirements imposed by the Biloxi Code, F & D conditionally agreed to issue two bonds in connection with the project as long as Sage, Hobbit Hill's contractor, was also bonded. Sage was unable to obtain bonding, and F & D suggested to McQueen that it apply for the bonds. McQueen agreed but demanded that Hobbit Hill enter into a direct contract with it to assure that it would fall within the protective ambit of the F & D bonds. Thereafter, McQueen and Hobbit Hill entered into a direct contract entitling McQueen to the lump sum amount of $276,000 upon completion of the site preparation. Hobbit Hill also agreed to compensate McQueen over and above this amount for work in addition to that agreed upon in the contract.

McQueen's surety United States Fidelity & Guaranty Co. (USF & G) issued two bonds on McQueen's behalf in connection with the Westwick project. Having met its requirements for bonding, F & D then issued on Hobbit Hill's behalf and with the City of Biloxi as obligee two separate bonds to secure the site improvements contract. F & D's bonds consisted of a performance bond and a labor and material payment bond each bearing a penal sum in the amount of the McQueen contract price of $276,000.

Shortly after the site preparation began it became apparent that McQueen's labor costs would far exceed the contract price. Rather than a few isolated pockets of muck anticipated by an initial engineering report, a wide band of muck extending across the center of the site required removal. Nonetheless, McQueen continued the prepara-

tion work and, when the city engineer accepted the project on July 7, 1983, the site preparation was complete.

The cost of McQueen's work totalled $703,371.15 of which $276,000 represented the original contract price and $427,371.15 was attributed to the additional mucking operation. The present dispute arises from Hobbit Hill's failure to pay McQueen in full. It is uncontested that upon 50% completion Hobbit Hill paid McQueen $112,500 of the $276,000. At trial, F & D introduced receipts of three other alleged "payments" which it claimed reduced Hobbit Hill's debt to McQueen. The trial court found that a $39,654 payment had been made by Hobbit Hill directly to one of McQueen's subcontractors; therefore, a set-off in this amount was allowed. The district court did not find credible testimony that Hobbit Hill, through Sage, paid McQueen $26,000 as a down payment on the project. Thus, the trial court denied this set-off. On appeal, the parties do not contest these rulings. By contrast, the parties continue to debate vehemently the nature of a $150,000 check which Hobbit Hill issued to McQueen in August of 1983. McQueen contends the $150,000 was merely a loan from Hobbit Hill to enable it to meet its payroll expenses until final payment on the project was received. F & D argues that the $150,000 constituted a payment under the contract. The trial court found for F & D on this issue and reduced Hobbit Hill's debt by an additional $150,000 leaving an outstanding balance of $401,226.15.

The trial court held as a matter of law that F & D was liable for the full outstanding balance and that, pursuant to § 85-7-185 of the Mississippi Code [1] (the "private works statute") or, alternatively, Mississippi common law governing third-party beneficiary status, McQueen was entitled to recover under both the performance and payment bonds. In addition, the trial court dismissed McQueen's claims for punitive damages and prejudgment interest on the amount owing under the payment bond reasoning that the unliquidated na-

1. Miss.Code Ann. § 85-7-185 (1972).

ture of the bond obligations precluded recovery of these items. In a subsequent hearing, the trial court ruled that McQueen was immediately entitled to the full amount of the payment bond which Hobbit Hill had interpleaded in March of 1985. This ruling led to a further reduction of $276,000 leaving $125,226.15 still owing. On November 18, 1987, the trial court entered final judgment in favor of McQueen for this amount.

On appeal, F & D claims the trial court erred in allowing McQueen to recover under the performance bond in addition to the payment bond. McQueen cross appeals arguing the trial court wrongfully dismissed its claims for punitive damages and prejudgment interest. McQueen also contends that the $150,000 check constituted a loan rather than a contract payment and consequently the set-off of this amount was erroneous. We hold that McQueen was only entitled to recover under the payment bond but that, since the amount owing under this bond remained unliquidated until after trial, dismissal of the claim for prejudgment interest was proper. We therefore reverse the district court's judgment finding F & D liable for $125,226.15 under the performance bond and affirm the dismissal of McQueen's claim for prejudgment interest. This disposition moots the question of whether the $150,000 was a contract payment or loan. For the reasons discussed below, we also affirm the dismissal of McQueen's punitive damage claim.

## II.

*Erie* requires that we apply Mississippi law to resolve this diversity case. The overriding issue at hand is whether Mississippi law enables McQueen to recover under F & D's performance bond. As mentioned, the trial court allowed McQueen to recover under both bonds on the alternative theories (1) that Mississippi's private works statute writes into every performance bond an additional payment obligation to laborers and materialmen, or (2) that McQueen qualified as a third-party beneficiary under the express language of the performance bond. On appeal, McQueen's

arguments track the district court's reasoning. F & D, in addition to attacking the district court's rationale, raises the argument that the contract between the City of Biloxi and Hobbit Hill constituted a "public works" whose bond requirements are governed by § 31–5–51 of the Mississippi Code.[2]

We pretermit the merits of F & D's "public works" argument because F & D failed to raise it in a timely manner. Several issues were resolved by motions before the non-jury trial of this matter. By way of summary judgment, the trial court held that McQueen was allowed to "stack" the payment and performance bonds and thus recover under each. F & D had every opportunity to present its "public works" theory to the trial court in its memorandum in support of its motion for summary judgment. Instead F & D pursued a theory inconsistent with the "public works" argument. Consequently, by order dated June 10, 1983, the trial court granted McQueen's motion for summary judgment without having been presented with F & D's "public works" argument. Approximately six months later F & D filed its motion for reconsideration of the summary judgment ruling and, for the first time, raised the "public works" defense. Although the trial court reviewed its earlier ruling, the memorandum opinion dated January 7, 1987, reflects that the trial court refused to consider F & D's new position.

On several occasions we have held that a party "may not wait until trial or appeal to develop claims or defenses in response to the summary judgment motion." *C.F. Dahlberg & Co., Inc. v. Chevron, U.S.A., Inc.,* 836 F.2d 915, 920 (5th Cir.1988); *Golden Oil Co. v. Exxon Co., U.S.A.,* 543 F.2d 548, 551 (5th Cir.1976). Here F & D has done just that: waited to see how its first theory fared and, after its deficiency became apparent, attacked from a new angle. Noting that conditions surrounding the assertion of this defense do not involve "exceptional circumstances which would re-

---

2. Miss.Code Ann. § 31–5–51 (Supp.1988).

sult in a miscarriage of justice,"[3] we abide by our general rule and decline to address F & D's "public works" argument.

■ F & D next argues that § 85–7–185 of the Mississippi Code should not be interpreted to allow McQueen to recover under both performance and payment bonds. Section 85–7–185 does not require a principal to provide a performance bond to secure the completion of a private works contract; however, if the principal chooses to provide such a bond, it must meet § 85–7–185's strictures. The pertinent part of § 85–7–185 reads:

> [S]uch [performance] bond shall also be subject to the additional obligations that such contractor or subcontractor, shall promptly make payments to all persons furnishing labor or material under said contract; and in the event such bond does not contain any such provisions for the payment of the claims of persons furnishing labor or material under said contract, such bond shall nevertheless inure to the benefit of such person furnishing labor and material under said contract....

Miss.Code. Ann. § 85–7–185 (1972). F & D's performance bond did not provide for the payment of persons furnishing labor and materials. Therefore, viewed in isolation from the payment bond, absence of protection in the performance bond inuring to the benefit of laborers and materialmen invokes operation of 85–7–185 which has the effect of engrafting into the bond the "additional obligation" of payment to such persons. That the express terms of the performance bond confer the exclusive right of action on the City of Biloxi and not laborers and materialmen is inconsequential. The Mississippi Supreme Court has held that laborers and materialmen "are protected regardless of the conditions of the [performance] bond." *Western Casualty & Sur. Co. v. Stribling Bros. Machinery Co.*, 244 Miss. 12, 139 So.2d 838, 840 (1962). Any stipulations to the contrary, such as the limitation of persons entitled to bring suit on the bond, are ineffective. *Hartford Accident & Indem. Co. v.*

*Natchez Inv. Co.*, 161 Miss. 198, 132 So. 535, 538 (1931).

We, however, are not viewing the performance bond in isolation. Rather, simultaneous with the execution of the performance bond F & D issued a payment bond bearing a penal sum of $276,000 naming Hobbit Hill as the principal and the City of Biloxi as obligee. Under the express terms of the payment bond, a right of action for unpaid sums accrued to any person providing labor and materials under the contract between Hobbit Hill and the City of Biloxi. There can be no question that laborers and materialmen were protected to the extent of the contract amount under the payment bond. The question becomes whether, in light of the payment bond protection, § 85–7–185 writes into the performance bond the additional obligation of securing payment to laborers and materialmen. We hold that, where the parties simultaneously execute a payment bond bearing a penal sum in an amount equal to or greater than that of a separately executed performance bond, the payment bond supplants the "additional obligations" imposed by § 85–7–185.

Neither Mississippi courts nor this court construing Mississippi law have addressed the precise question before us. However, the Mississippi Supreme Court has instructed that statutes phrased in "general and comprehensive terms apply to and include all things within those terms, not only as presently existing, but as well as those which subsequently come into existence, although having no existence at the time of enactment." *Tri–State Transit Co. of Louisiana v. Stone*, 196 Miss. 23, 16 So.2d 782, 784 (1944). Thus, we consider it of utmost importance that the language of § 85–7–185 be considered with a view to the development of construction bonding schemes.

The American Institute of Architects (AIA) has been involved in promulgating various "documents" or forms to advance the standardization of construction contracting. The performance bond issued by

---

3. *C.F. Dahlberg*, 836 F.2d at 920.

F & D to secure the Westwick project was a standard AIA form referred to in the industry as "A.I.A. Document No. A–311." One commentator informs us that before 1946

> there was no pattern of uniformity with respect to bonds on private construction. In an effort to correct this situation, interested groups promulgated a form consisting of a separate performance and payment bond which became known as A.I.A. Doc. No. 107. The American Inst. of Architects, in 1958, revised this form of performance and payment bonds. This new document is AIA Doc. No. A–311.

Cushman, Surety Bonds on Public and Private Construction Projects, 46 A.B.A. J. 649, 650 (1960). Although the practice of separating bond obligations did exist in Mississippi before 1946,[4] it was not the standard.

Beginning in 1918,[5] in what appears to have been a response to the lack of an industry-wide mechanism for securing payment to laborers and materialmen, Mississippi's legislature remedied the lack of protection that accompanied the practice of issuing a single performance bond by statutorily imposing an "additional obligation" of payment to benefit laborers and materialmen. Were we to ignore the evolution of construction bonding schemes, § 85–7–185's language, being identical to the early codifications of the 1918 statute, would operate to impose an additional payment obligation for the benefit of materialmen and laborers. However, for the reasons discussed below, we consider it imprudent to interpret § 85–7–185 without regard to the additional protection available to laborers and materialmen under today's dual bonding scheme.

Though representing a step forward in protecting subcontractors, § 85–7–185 does not assure laborers of even pro rata payment. The performance bond's fundamental purpose of protecting the project owner or obligee cannot be overlooked. If a conflict arises between an obligee and a subcontractor over the proceeds of a performance bond, § 85–7–193 expressly provides that the obligee's claims are superior and that proceeds made available to an obligee diminish funds available to other claimants. Therefore, if the funds needed to complete a project exceed the bond's penal sum, the obligee's recovery will exhaust the surety's liability leaving laborer and materialmen's subordinated claims unsatisfied.

The practice of issuing dual performance and payment bonds eliminates the problem of subordination. Regardless of an owner's recovery under a performance bond, the payment bond's penal sum remains available to satisfy the claims of materialmen and laborers. In this respect, dual performance and payment bonds advance the protection afforded by § 85–7–185's "additional obligation" language by actually assuring laborers and materialmen that a fund will be available to meet their legitimate claims. By promoting this practice of issuing separate bonds, the Mississippi legislature's intent of providing greater predictability and security to construction participants will be appropriately furthered.

Were we to read § 85–7–185 as providing laborers and materialmen with a right of action under the performance bond in addition to recovery under a simultaneously issued payment bond, the evolutionary protections available to such persons undoubtedly would be diminished for all practical purposes. Sureties, owners, and contractors would be unwilling to issue and secure separate bonds with the knowledge that laborers and materialmen would be able to satisfy cost overruns by looking to the performance bond. Moreover, if the industry returned to the practice of issuing a single performance bond incorporating the "additional obligation," laborers and materialmen's recovery under such bond again would be subject to subordination to the owner's completion needs. Either scenario

---

**4.** *See Hartford Accident & Indemnity v. Hewes,* 190 Miss. 225, 199 So. 93 (1940) (separate payment and performance bonds issued).

**5.** 1918 Miss. Laws ch. 128 (recodified as Miss. Code Ann. § 2276 (1930) further recodified as Miss.Code Ann. § 374 (1942)).

represents a marked detraction from the predictability and security fostered by the dual bonding scheme.

We are not the first to consider whether statutorily imposed payment obligations supplement protection afforded by a separately executed payment bond. In *Jimco v. Gentilly Terrace Apartments, Inc.*, 230 So.2d 281 (La.App.1970), a Louisiana court addressed virtually the identical issue before us and held that, where separate payment and performance bonds were issued, the statutory requirement that "such bond" include payment to subcontractors had been met. In *Jimco* an owner and contractor entered into a contract for the construction of a building. Two bonds were furnished in connection with the project: a performance bond issued by Peerless Insurance Co. and a payment bond issued by Marquette Casualty Co. Plaintiff Jimco had not been paid by the contractor for materials furnished in the construction and could not recover under the payment bond because the Marquette Casualty Co. had been rendered insolvent. After unsuccessfully attempting to recover from the project owner, Jimco sought to recover under the performance bond. Jimco based its theory for recovery on Louisiana's Private Works statute which, at the time of suit, provided in part:

> [T]he condition of *the bond* shall be the true and faithful performance of the contract and the payment of all subcontractors, journeymen, cartmen, workmen, laborers, mechanics, and furnishers of material, machinery or fixtures jointly as their interest may arise.

La.Rev.Stat.Ann. § 9:4802 (emphasis added). Jimco argued that, despite the bond's language solely conferring a right of action on the obligee, the Private Works statute had the effect of writing into the performance bond an obligation to pay laborers and materialmen. Louisiana's Fourth Circuit Court of Appeals disagreed concluding that

> LSA–R.S. 9:4802 requires as conditions for *the bond* the true and faithful per-

formance of the contract and the payment of all furnishers of material as their interests may arise. These requirements were met by *the two bonds* executed by the contractor and the sureties. *Jimco*, 230 So.2d at 284 (emphasis added).

Thus, although the Private Works statute clearly contemplated a single bond embracing dual obligations, the court held that Jimco could not recover under the performance bond.

In that bifurcation furthers the protection to laborers and materialmen, we find the reasoning in *Jimco* compelling. We therefore conclude that F & D's dual payment and performance bonds afforded more than the statutorily required protection to laborers and materialmen and, in doing so, satisfied the additional payment obligation imposed by § 85–7–185.

 The trial court alternatively held that McQueen was a third-party beneficiary under the performance bond and therefore entitled to sue under such bond. The court reached this conclusion by employing the following syllogism: The express terms of the performance bond obligated F & D to pay on the bond unless Hobbit Hill "promptly and faithfully perform[ed] said contract [found to exist between it and the City of Biloxi]." The contract in turn required Hobbit Hill to "provide and pay for all materials [and] labor ... necessary for the performance of this contract." [6] Armed with these premises the district court concluded that as long as Hobbit Hill failed to pay for materials and labor as required by the contract the performance bond remained in effect and conferred benefits on those persons such as McQueen whom Hobbit Hill had not paid.

The Mississippi Supreme Court recently reiterated the analysis developed to determine when a "stranger" to a contract may bring suit as a third-party beneficiary:

> [*When* ] (1) ... the terms of the contract are expressly broad enough to include the third party either by name or as one of a specified class, and (2) the said third

---

**6.** *See* Technical Specifications For Westwick Subdivision, § 3.1 (delineating the site preparation requirements).

party was evidently *within the intent of the terms so used,* [then] said third party will be within its benefits, if (3) the promisee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract.

*Mississippi High School Activities Assoc. v. Farris,* 501 So.2d 393, 396 (Miss.1987) (emphasis added) (quoting *Yazoo & M.V.R. Co. v. Sideboard,* 161 Miss. 4, 133 So. 669, 671 (1931)). We conclude that McQueen does not satisfy the requirements necessary to maintain the status of a third-party beneficiary under the F & D performance bond.

McQueen was not "within the intent of the terms so used" in the bond. First, the bond expressly states that "No right of action shall accrue on this bond to or for the use of any person or corporation other than [the City of Biloxi]...." This express clause negates any inference arising from the bond's condition that the payment obligation will inure to the benefit of laborers and materialmen not fully paid by Hobbit Hill. Second, the parties simultaneously executed a payment bond that expressly gave claimants such as McQueen a right of action to recover under such bond. Finding that these two items reflect the parties' intent to exclude McQueen as a third-party beneficiary, we hold that the district court erred in allowing McQueen to recover under this alternative theory.

### III.

■ By way of cross-appeal, McQueen contends the trial court erred in denying its claim for prejudgment interest on the payment bond sum of $276,000. This court has recognized that, under Mississippi law, the decision to grant prejudgment interest lies in the trial court's discretion. *Dunn v. Koehring Co.,* 546 F.2d 1193, 1201, *reh'g granted in part on other grounds,* 551 F.2d 73 (5th Cir.1977). The Mississippi Supreme Court has consistently held that "prejudgment interest[ ] may be allowed in cases where the amount due is liquidated when the claim is originally made, or where the denial of the claim is frivolous or in bad faith." *Aetna Cas. & Sur. Co. v. Doleac Elec. Co., Inc.,* 471 So.2d 325, 331 (Miss. 1985) (citations omitted). A claim is unliquidated if a legitimate dispute exists as to the amount due. *See Doleac,* 471 So.2d at 325; *O.J. Stanton & Co. v. Dennis,* 360 So.2d 669, 673 (Miss.1978).

The trial court did not abuse its discretion in denying prejudgment interest because a legitimate dispute existed as to the amount Hobbit Hill owed McQueen under their contract and consequently as to the amount due under F & D's payment bond. When McQueen originally brought its claim against F & D, it demanded payment in the amount of $551,226.15. F & D, however, claimed that Hobbit Hill paid McQueen $150,000 thereby reducing Hobbit Hill's debt. Whether the $150,000 check from Hobbit Hill to McQueen constituted a loan or contract payment has been legitimately disputed since the commencement of this litigation. Thus, until the trial court's ruling on the nature of the check, the magnitude of Hobbit Hill's debt to McQueen remained uncertain and therefore unliquidated.

Despite McQueen's arguments to the contrary, since the amount due under the construction contract was unliquidated, F & D's liability under the payment bond remained unliquidated as well. As the district court's analysis implied, the terms of the payment bond provide that the penal sum of the "bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder...." Thus, the district court's finding that the $150,000 check constituted a contract payment had the twofold effect of (1) reducing the extent of Hobbit Hill's outstanding debt and (2) diminishing the payment bond's penal sum. Because McQueen's original demand under the payment bond was not liquidated, its claim for prejudgment interest was properly denied.

### IV.

■ McQueen also cross-appeals the trial court's dismissal of its punitive damage claim. McQueen advances several theories supporting its position that it is entitled to

punitive damages because of F & D's refusal to make payments under the performance or payment bonds. At the outset of this discussion we note that in insurance litigation

> Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed 'with caution and within narrow limits.' ... '[A]ny plaintiff asking for punitive damages ... based on bad faith of an insurance company has a heavy burden.'

*Life & Cas. Ins. Co. of Tennessee v. Bristow*, 529 So.2d 620, 622 (Miss.1988).

Under Mississippi law, if the evidence suggests that an insurer had a " 'reasonably arguable basis' for denying a claim, then its conduct cannot constitute bad faith." *Szumigala v. Nationwide Mut. Ins. Co.*, 853 F.2d 274, 280 (5th Cir.1988). "A claim of bad-faith denial thus 'should not reach the jury unless reasonable minds could differ as to the insurance company having a legitimate or arguable reason for denying the claim.'" *Id.* (quoting *Dueringer v. Gen. Am. Life Ins. Co.*, 842 F.2d 127, 130 (5th Cir.1988)). Our holding precluding McQueen from recovering under the performance bond indicates that F & D had a reasonably arguable basis for denying payment under that bond; therefore, the claim for punitive damages with respect to the *performance* bond cannot stand.

McQueen predicates its punitive damage claim relating to the *payment* bond on (1) F & D's failure to investigate the claim before McQueen filed suit; (2) the contention that F & D's trial defenses failed to adduce a reasonably arguable basis for denying the claim under the payment bond; and (3) F & D's alleged attempt to coerce McQueen into settling its claim. We address and reject these arguments in turn.

This court has recognized Mississippi's rule that an "insurance company has a duty to investigate promptly and adequately *an insured's claim.*" *Szumigala*, 853 F.2d at 280 (emphasis added). However, "the plaintiff's burden in proving a claim for bad-faith refusal goes beyond merely demonstrating that the investigation was negligent." *Id.* After reviewing the record in a light most favorable to McQueen, we find no evidence sufficiently indicating that a formal claim had been made before suit was filed.

At most, McQueen's evidence leads to the conclusion F & D was aware that Hobbit Hill had not paid McQueen when the project was completed and that if McQueen could not secure payment from Hobbit Hill it would look to the F & D bonds. McQueen's argument can be reduced to the contention that an insurer has a duty to investigate a *potential* claim. We do not believe Mississippi courts would extend the duty to investigate to the period before a formal claim is made. However, even if the evidence reflected that a formal claim had been made, McQueen presented no evidence to suggest that the failure to investigate amounted to anything more than negligence. Having failed to sustain its burden of proof, McQueen's punitive damage claim based on this theory must fail.

McQueen's contention that F & D's defenses failed to give rise to a reasonably arguable basis for denying McQueen's claim is equally unpersuasive. The trial court held that the existence of a legitimate dispute over the nature of the $150,000 check and the existence of an alleged payment from Hobbit Hill to McQueen through Sage created a reasonably arguable basis for denying the claim. We agree. Despite McQueen's statement that the practice of reducing the payment bond's penal sum by payments received by McQueen constitutes "Voodoo mathematics," the express terms of the payment bond provide that such reduction is wholly proper. Legitimate dispute over whether payments had been made gave rise to concomitant defenses as to the amount owing under the payment bond. The existence of legitimate defenses necessarily implies a reasonably arguable basis for denial of recovery.

Lastly McQueen claims that the terms of F & D's offer to pay $163,500 under the payment bond evidenced its bad faith. Specifically, after McQueen filed suit thereby formally apprising F & D of its claim, F & D offered to pay McQueen $163,500 under

the payment bond *if* McQueen agreed to drop its claims for punitive and "extra contractual" damages. McQueen cites *Travelers Indemnity Co. v. Wetherbee*, 368 So.2d 829 (Miss.1979), for the proposition that "[u]nder Mississippi law, an insurer may not legitimately refuse to pay sums it admits it owes to try to coerce a settlement."[7] We find *Wetherbee* inapposite to the facts at hand. In that case, a fire insurance policy contained distinct coverage for loss of contents and for structural repairs. The insured and insurer agreed that the loss of contents amounted to $6000; however, the parties disputed the amount necessary to repair the home. With knowledge that the insureds were in dire financial straits, the insurer refused to forward the $6000 until an agreement had been reached on the entire claim. The Supreme Court of Mississippi held that the evidence supporting the alleged intentional withholding of contents coverage was sufficient to create a jury question on the insureds' punitive damage claim.

We read *Wetherbee* to stand for the proposition that an insurer may not delay remittance of funds undisputedly owing under an insurance policy in an attempt to coerce a settlement for an amount less than the sum admitted due. We are not faced with that situation in the instant case. Rather, McQueen sued F & D before making a formal claim and, in doing so, immediately placed the surety in an adversarial posture. After gathering information regarding the claim, F & D offered to pay $163,000 on the payment bond if McQueen agreed to abandon its claims for punitive and "extra contractual" damages. F & D did not attempt to coerce McQueen into accepting a sum less than $163,000 or into compromising its claims *under the terms of either bond*. Instead, F & D attempted to persuade McQueen to vacate the claims that arose solely by reason of the litigation. Since we find McQueen's punitive and "extra contractual" claims, i.e.

claims attributable to the litigation context, distinguishable from demands under a bond or insurance policy, we find *Wetherbee* inapplicable.

In light of the above analysis and the Mississippi Supreme Court's promptings that punitive damage awards are to be affirmed "with extreme reluctance"[8] and claims allowed "only with caution and within narrow limits,"[9] we conclude that the trial court properly dismissed McQueen's punitive damage claims.

### V.

For the foregoing reasons, the judgment is REVERSED insofar as it imposes liability on F & D under the performance bond and AFFIRMED in all other respects.

---

7. Appellee's Brief at 41.

8. *Bankers Life & Cas. Co. v. Crenshaw*, 483 So. 2d 254, 276 (Miss.1986), *aff'd on other grounds*, —— U.S. ——, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988).

9. *Standard Life Ins. Co. of Indiana v. Veal*, 354 So.2d 239, 247 (Miss.1977).