368 So.2d 829 (1979)
The TRAVELERS INDEMNITY COMPANY, Defendant/Appellant,
v.
Carl W. WETHERBEE et ux, Plaintiffs/Appellees.
No. 50769.
Supreme Court of Mississippi.
March 14, 1979.
Rehearing Denied April 4, 1979.
*830 Megehee, Brown & Williams, John M. Kinard, Pascagoula, for defendant/appellant.
C.R. McRae, Pascagoula, for plaintiffs/appellees.
Before PATTERSON, SUGG and BOWLING, JJ.
PATTERSON, Chief Justice, for the Court:
Travelers Indemnity Company appeals from a judgment of the Circuit Court of Jackson County. The suit was based upon a fire insurance policy purchased by Carl and Lula Bell Wetherbee for coverage on their dwelling, its contents and additional living expenses. The judgment against Travelers resulted from a jury verdict of $50,000, compensatory damages, and $50,000, punitive damages. The agency, Wortman & Mann, which sold the insurance and held the Wetherbees' mortgage, was also a defendant in the trial court but was nonsuited at the conclusion of the evidence.
The Wetherbees purchased their home in early 1975 by assuming a loan of $17,500. At the time the dwelling was protected by a policy of Travelers which was renewed and the coverage increased in December 1975 at the suggestion of Travelers' agent. The renewed policy limits were $20,000 upon the dwelling, $6,000 upon its contents and $2,000 additional living expense in case of loss.
The dwelling was severely damaged by fire on February 14, 1976, which was reported to Travelers on February 17, 1976, and a draft for $500 was promptly issued to the Wetherbees. On February 18, 1976, Barry Wallace, a claims representative of Travelers, inspected the burned dwelling with the Wetherbees to ascertain the extent of damage. While this investigation was under way, Fire Marshal Rivers arrived and requested Wallace to speak with him apart from the Wetherbees. They retired and Rivers advised Wallace that Wetherbee was "a prime suspect in the fire of his own house as well as at another place." Wallace informed the Wetherbees of this report and after advising them of the provisions for their cooperation in the policy, sought information concerning their whereabouts and activities at the time of the fire. He also requested and received their consent to submit to a polygraph examination. Thereafter, his "Account Reevaluation Notice" was filed with Travelers who cancelled the policy on March 21, 1976, and declined payment to the Wetherbees during the course of the fire marshal's investigation.
Meanwhile, the Wetherbees resided in motels until their funds were exhausted and then moved into a low income housing project while they sought a more suitable place of abode. More recently they have lived with their five children in various apartments, none of which afforded the accommodations they had previously enjoyed in their dwelling. During this time they continued to make mortgage payments, with difficulty, on their burned dwelling to prevent its foreclosure. Faced with both *831 dwelling and apartment payments and inconvenience, they engaged an attorney on March 31, 1976, to conclude their claim against Travelers.
During this interval Wallace had requested the Wetherbees to obtain an estimate of cost to repair the dwelling and when none was forthcoming engaged Waymon Clegg, a building contractor, on March 23, 1976, to make such. Shortly thereafter, Clegg's estimate of $14,137.24 was submitted to Wallace.
Also during this interim Honorable Guy Faggard, the Wetherbees' attorney, had written Wallace that his clients were anxious to cooperate with Travelers so they might bring their claim to an early conclusion. Wallace contacted Faggard in response and the claim was discussed and later, April 13, Faggard sent Wallace a list of the contents of the house which had been destroyed, as well as an estimate of repair of the dwelling which had been submitted by Patel Properties, a construction concern, at the request of his clients. This estimate was $23,889.38, a sum in excess of the policy limit. At this time Faggard also advised of the extra living expenses incurred by his clients because of their inability to occupy their residence and requested prompt payment.
On May 21, 1976, Faggard wrote Wallace reminding him of his previous correspondence and again requested an early settlement which was not forthcoming.
Thereafter, on May 25, 1976, the fire marshal's report exonerating the Wetherbees of arson terminated that investigation.
Two days later, May 27, 1976, Wallace attempted to settle the claim, but without success. Apparently, this offer of settlement was upon the basis of a communication from his superior which states in part: "Please try to compromise with attorney for buildings and contents only and eliminate any ADL... ." The "ADL" within the quotation was explained as a reference to additional living expenses. During the course of the trial, after acknowledging a dispute as to the repair of the building, Faggard testified concerning his request for payment of the destroyed contents as follows:
Q. Prior to obtaining this bid, had he ever made any objections to you?
A. I don't know if he already had the bid from Clegg or not. In other words, he wouldn't pay the Patel bid. I know that.
Q. Did you on any occasion ask him to pay the contents after you had a dispute with him on the other?
A. Oh, yeh.
Q. Did he pay the contents?
A. No, he did not.
Q. Did he agree with you that this company owed the $6,000 on contents?
A. No question about the value of the contents. The value of the contents, according to the list that they made up, is over $15,000. They had some $6,000 coverage on the contents.
Q. But he would never pay that?
A. He wanted to settle both the repair of the dwelling and the contents at the same time.
Q. Did he ever make the statement that that was a company policy not to separate the two?
A. That's correct.
Q. Did you then have your clients, Mr. and Mrs. Wetherbee, to obtain another estimate?
A. Yes, sir.
Faggard went on to relate that within a month of May 21 when he had written Wallace, that Wallace responded with an offer of settlement based upon the repair estimate of approximately $14,000 and payment of $6,000 for loss of contents. Although this offer was unacceptable to the Wetherbees, it nevertheless led to further discussion and tentative agreement to arbitrate. To this end the Wetherbees obtained another estimate from a different concern which was submitted on June 22, 1976, in the sum of $23,537.85. Travelers also obtained an estimate from General Adjustment Bureau on August 30, 1976, in the sum of $14,196.14. General Adjustment Bureau, who was also agreed upon by the *832 parties to arbitrate the difference, declined to do so.
Sometime in July 1976 the Wetherbees retained Honorable C.R. McRae to replace their previous attorney. On July 23 and again on September 1, 1976, he wrote Travelers demanding prompt settlement of the claim or claims. An explication of this correspondence might be best portrayed by quoting the cross-examination of Witness Wallace by Attorney McRae:
Q. Now, you said you were never called upon to pay any additional living expenses. Mr. Faggard says he asked you to do it in his letters and talking to you. But disregarding that, just look over to the next page. After you have had the instructions from Mr. Watts to eliminate them, you had a certified letter from me, didn't you? On July 23rd, 1976.
A. The letter was to me; right.
Q. Addressed to you, certified mail, and the date of that letter was what?
A. July 23, 1976.
Q. And in that letter did I not request that we are also calling on you to pay immediately the contents and additional amount of money for advanced living expenses? As you recalled, you advanced  and this is where I had gotten the understanding that that first $500.00 was advanced living, but it was contents as we found out  advanced within a week's time $500.00 for the advanced living expenses. However, you have refused to forward any other money. As you know, this puts the insured in a position to force them to settle the case at a lower price. We therefore call upon you to immediately release the advanced living expenses as called upon in the policy  the contents money, as well as the money to fix the house.
A. But you didn't send any receipts with the letter. There was no proof. There was just strictly a letter.
Q. Now you made some notations on my letter of July the 3rd, did you not, in your own handwriting at the bottom? Rent, $284.00 a month.
A. This is a figure I believe you mentioned.
Q. It's not mentioned in the letter.
A. In our meeting of 9-1.
Q. Oh, so that was done in 9-1?
A. I made that entire notation on 9-1.
Q. Okay, let's get on to my next letter in September. "You further advised that you would not pay the contents now or any more advanced payment until our client agreed to your terms  this was confirming our meeting of 9-1  and accepted the offer that is being made by you. We advise you that our client is in dire financial circumstances due to the fact that as a result of the case being dragged out, it has caused a tremendous financial burden on them, and they are desirous of the $6,000.00 for contents and the cost of living money that should have been advanced to them some time ago. You stated that it is your company's policy that they would not settle the case  not settle anything further or write any more checks until the case is settled in its entirety. We feel that this is very arbitrary and capricious position on your company's part and we again call upon you to forthwith settle the contents and give the additional $1500.00 for advanced payments that they are due and owing to our clients, in particular since there is no dispute over these items."
You stated the Clegg estimate. We go on here again about that. But in that letter we also go in to about the Regency  the apartment rent is $284; but you don't make any notation on that. You made it on the July letter.
A. But you still didn't sent any receipts, Mr. McRae.
Q. But we agreed that there was no dispute over those items, didn't we?
A. There was no dispute in my mind over any of the claim. We were ready to pay it, and in fact, I note on my claim sheet in our meeting  "met with McRae, explained offers of the $14,000 and the $6,000.00."
The disparity between the Wetherbees' estimates of repair, both in excess of the policy limit of $20,000 on the dwelling, and *833 Travelers' estimates, each less than $15,000, produced a conflict that could not be resolved. The coverage of $2,000 for additional living expenses was likewise not resolved because Travelers had never been furnished receipts for the expenses. The loss of contents claim was apparently not paid, according to Travelers, because it was not requested separately from the other claims until Attorney McRae entered the proceedings, the demands of Attorney Faggard having been made within the interval of the arson investigation or very shortly thereafter.
Suit was filed by the Wetherbees on December 21, 1976, against Travelers and Wortman & Mann. The declaration as amended concluded with demands upon Travelers for the coverage under the policy, $20,000 for the dwelling, $6,000 for the contents and $2,000 for additional living expenses, as well as a demand of $100,000 actual damages for tortious breach of contract and $1,000,000 for punitive damages. By a second count Wortman & Mann, Inc. was alleged to be the insurance agent of Travelers as well as the holder of the Wetherbees' mortgage, and conspired with Travelers to wrongfully threaten foreclosure "to economically force the said plaintiffs to settle and agree to the demands of the said defendant Travelers; that said acts of the defendant constituted a bad faith departure from their duty of good faith and fair dealing owed to the said mortgagor and/or insured" for which they demanded actual damages of $50,000 and punitive damages of $200,000.
As mentioned, Wortman & Mann, Inc. was nonsuited at the conclusion of the evidence and the jury returned a verdict of $50,000 compensatory damages, and $50,000 punitive damages, and judgment in accord was entered.
Travelers assigns as error:
1. The trial court erred in permitting into evidence a list of extra living expenses by the appellees.
2. The evidence failed to support the granting of a punitive damage instruction.
3. The jury's verdict for actual damages was against the overwhelming weight of the evidence and appellees' instructions concerning these damages were erroneous.
4. The lower court erred in granting appellees' Instruction No. 5.
5. The lower court committed error in allowing appellees' "good faith" Instruction No. 13.
6. The lower court erred in allowing the appellees' attorney to amend the declaration to seek a ten-fold greater demand the day prior to trial without notice to the appellant.
We need not address the first assignment of error because Travelers has offered to pay the additional living expenses even though it maintains the appellees did not submit the receipts required by the policy.
We are of the opinion the punitive damage instruction was properly granted. In discussing it, we need mention the continuing argument of the appellees that the great differences in the wealth of the litigants has created an extreme imbalance in their bargaining positions, favoring Travelers in prolonging settlement. In acknowledging this argument we do not say or infer that the appellant engaged in any wrongful action but we do so to point out that the opportunity for economic pressure does not imply the fact. A punitive damage instruction must be, as are other instructions, supported by the evidence. A brief resume of the evidence follows:
The Wetherbees' house burned February 14, which was reported to Travelers February 17 and it promptly issued its draft for $500 to the insureds. Travelers' agent was advised on February 18 that Wetherbee was suspected of arson. Payments under the policy were withheld during the arson investigation which terminated favorably to the insureds on May 25, 1976. On May 27 Travelers began negotiations to settle, using an estimate it had obtained during the interval. These negotiations failed on June 16 when Wallace declined to pay more than $14,087.24 for the dwelling and $6,000 for its contents. Nevertheless, negotiations *834 continued with the insureds obtaining another estimate of repairs on June 22 and with Wallace seeking from General Adjustment Bureau an estimate for Travelers, hopefully, to the end the dispute might be terminated, probably through arbitration.
No later than July 23 another attorney began his representation of the appellees with a demand "to immediately release the advance living expenses as called upon in the policy  the contents money, as well as the money to fix the house." Discussions followed and another demand on September 1 was made for the additional cost-of-living coverage and for the destroyed contents. This was confirmed by a self-serving letter of the attorney on September 2. Wallace testified that the first demand for the contents coverage, separate from the other coverages, was made by Attorney McRae. This conflicts with the testimony of Attorney Faggard who testified that he requested the contents coverage apart from the other protections. However, Faggard's request seems to have occurred during the interim of the arson investigation or, at the latest, very shortly thereafter.
The deposition of Max Runnels, Travelers' Supervisor of Property Claims, is in evidence. It provides in part:
BY MR. McRAE: (Continuing)
Q. Now, Mr. Runnels, you had Mr. Wallace issue his draft to the Wetherbees for the contents on February 4, 1977.
A. Yes.
Q. For $6,000, I believe.
A. That's correct.
Q. That was about a year after the fire loss.
A. Yes.
Q. Why?
A. Why?
Q. Um-hum.
A. Well, the  of course, when I assumed the file, the insured had retained an attorney; the file reflected that an offer had been made to settle it for the entire amount on the  what estimate we had on dwelling plus the full amount of the contents. I didn't know at that time why we had not paid the contents separate from the dwelling. I discussed this matter with John Kinard; he and I felt that we should go ahead and issue the contents check because I didn't see any reason why we shouldn't. We didn't want to be in a position where it would appear that we were trying to deal in any type of bad faith. In my opinion, the contents check should have been issued a long time ago. Why it wasn't, I don't know.
Q. How often do you review these fire files?
A. It all depends; if it's in a suit, it may be every 30 days or it may be every 60 days. It all depends on what activity is going on.
Q. Okay. You do not have a policy that you will not settle the dwelling without settling the contents at Travelers?
A. No, we do not.
The testimony discloses an interval from February 17, 1976, until May 25 when payments were withheld during the arson investigation although some negotiations were made during the time, an interval from May 27 until about September 17 when more serious negotiations were under way, an interval from September 17 until December 21 when negotiations were suspended because Travelers concluded a suit would be filed.
As stated, we are of the opinion the punitive damage instruction was properly granted. The primary reason for this conclusion is the delay reflected in the evidence outlined above. Our secondary reason, necessarily related to the above, is that the plain terms of the policy requiring payment within sixty days of the proof of loss were ignored. Granting reasonableness to Travelers in withholding all payments during the arson investigation, nevertheless this terminated on May 25, 1976, and the contents payment was not tendered until February 4, 1977, more than 190 days subsequent to the expiration of the sixty-day period, and this occurred when Travelers had certain knowledge of the loss and repeated demands for payment had been *835 made. The only explanation for nonpayment, not plausible to our minds, is that the contents coverage was not separately requested until Attorney McRae entered the proceedings in July. Granting verity to the last statement, although it conflicts with other testimony, payment, without explanation, was still not made within sixty days thereafter.
Thirdly, we find no direct evidence of economic pressure upon the Wetherbees to settle these claims favorably to Travelers. We do find, however, evidence that each time Travelers responded to a request for payment it offered the contents coverage in conjunction with an offer to pay the dwelling coverage upon the low estimate for repair. This occurred when Travelers knew, at the very least, somewhat of the dire financial straits of the insureds because its agent, Wortman & Mann, Inc., the appellees' mortgagee, had threatened foreclosure.
In sum, we do not know why Travelers violated its contract by not paying the contents coverage, but it did, leaving a strong inference that it was for economic gain. We can fathom no other reason and none has been offered. The instruction was proper, in our opinion, provided our law permits the division of a policy so that various items of coverage may be considered as separate contracts although bound together in one policy.
In Claxton v. Fidelity & Guaranty Fire Corporation, 179 Miss. 556, 175 So. 210 (1937), we held an insurance policy covering a dwelling and its contents was divisible and enforceable to the dwelling although the coverage for the contents was denied because the insured had misrepresented the value of the contents. It logically follows, we think, that if a separate item of coverage in a multi-coverage policy may be unenforceable because of the misrepresentations of the insured, then surely nonpayment of a separate item of coverage by the insurer is likewise subject to penalty. Differently stated, an insured is penalized for misrepresentations through loss of coverage, whereas the insurer is penalized for wrongful acts through punitive damages. While it is true that Claxton, supra, and its progenitors, cited therein, do not address punitive damages, they do unequivocally establish the divisibility of policy coverages so they may be considered as separate contracts even though the premiums are paid in the entirety, not presently true as separate premiums were paid for the coverages. There are, inescapably, three distinct contracts in this one policy, each subject to separate consideration so that an insurer may be liable for punitive damages on one contract even though other contractual payments are delayed because of legitimate dispute.
We conclude the punitive damage instruction was proper and that the evidence was sufficient to support the verdict for damages thereunder arising from the intentional withholding of the contents coverage, a gross breach, the equivalent of an independent tort. Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1978); Progressive Casualty Ins. Co. v. Keys, 317 So.2d 396 (Miss. 1975); D.L. Fair Lbr. Co. v. Weems, 196 Miss. 201, 16 So.2d 770 (1944); American Ry. Express Co. v. Bailey, 142 Miss. 622, 107 So. 761 (1926); and Hood v. Moffett, 109 Miss. 757, 69 So. 644 (1915).
However, the verdict for compensatory damages in the sum of $50,000 causes much concern. An instruction was granted the plaintiffs which directed the jury to award damages for all "detriment" suffered by the plaintiffs in the event the jury believed the plaintiffs were entitled to a verdict for compensatory damages. It follows:
If you believe from a preponderance of the evidence that the Plaintiffs are entitled to a verdict against the Defendants for compensatory damages, it then will be your duty to award the Plaintiffs such amount of damages as will completely compensate them reasonably for all detriment suffered by them and of which the Defendant's conduct was a proximate cause. In arriving at the amount of the award you shall compensate them reasonably for any fears, anxiety and other mental and emotional distress and economic *836 losses resulting therefrom, if any, suffered by them and proximately resulting from the conduct in question.
We think this permitted the jury to grant damages for fears, anxiety and emotional distress, not supported by competent evidence, and even during the interim when the investigation for arson was under way, a time when payments were not unreasonably withheld. This was error, necessitating a reversal or a reduction of the award.
Although we are cognizant of the distinction between compensatory damages for tortious breach of contract and a judgment for the proceeds of an insurance contract, we nevertheless believe the verdict for "compensatory damages at $50,000" included the coverages under the policy. We therefore affirm the judgment for compensatory damages but reduce it to the limits of the policy, specifically, $20,000 for the dwelling, $6,000 for its contents and $2,000 additional living expenses less $500 previously paid. The judgment in excess of this amount was erroneous, in our opinion, because there is no competent evidence to support actual damages arising from the breach of the contract. Since this is so, we do not reach the question of whether actual damages for tortious breach of contract may be properly awarded in addition to punitive damages arising from an independent tort and the proceeds of the policy. In Standard Life Insurance Co. of Indiana, supra, we upheld a judgment for punitive damages in conjunction with an award for the policy coverage. In our opinion this satisfied the requirement that punitive damages will not be awarded absent actual damages. We presently think it is fulfilled since the verdict for exemplary damages is in conjunction with compensatory damages including the policy proceeds.
AFFIRMED AS MODIFIED.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.