644 So.2d 253 (1992)
Theresa M. NECAISE and Larry J. Necaise
v.
U.S.A.A. CASUALTY COMPANY and Pamela Necaise Nuccio.
Theresa M. NECAISE and Larry J. Necaise
v.
Pamela Necaise NUCCIO.
Nos. 90-CA-0141, 91-CA-0043.
Supreme Court of Mississippi.
December 31, 1992.
Opinion Denying Rehearing October 27, 1994.
*254 Jack Parsons, Rebecca C. Taylor, Parsons & Taylor, Wiggins, for appellants.
Patrick H. Zachary, Aultman Tyner McNeese & Ruffin, Hattiesburg, for appellees in No. 90-CA-0141.
Albert L. Necaise, Gulfport, for appellees in No. 91-CA-0043.
En Banc.
ROY NOBLE LEE, Chief Justice, for the Court:
Theresa M. and Larry J. Necaise filed their complaint to begin this suit on October 3, 1988, seeking contractual and punitive damages arising out of an insurance contract entered into with United States Automotive Association Casualty Co. (U.S.A.A.). More specifically, the complaint alleged that U.S.A.A. had breached its duty of good faith and fair dealing in: (1) refusing to pay benefits under a policy of insurance; (2) withholding payment willfully and in bad faith and (3) contrary to the express provisions of the policy. U.S.A.A.'s answer, filed February 23, 1989, stated a counterclaim in interpleader against Pamela Necaise Nuccio and U.S.A.A. deposited $41,033.40, the amount of insurance proceeds in dispute, with the court clerk.
Thereafter, on May 1, 1989, an agreed order was entered joining Pamela Necaise Nuccio as a party to the suit. Nuccio filed a "Motion for Claim and Entry" on July 2, 1989, requesting that she be awarded one-half of the interpled proceeds, since she was record owner of a one-half interest in the destroyed property. U.S.A.A. filed a motion for summary judgment on September 15, 1989, which the court granted as to the portion of the policy dealing with dwelling loss and punitive damages, leaving only the claim for further living expenses. The order also severed the portion of the case dealing with the proper distribution of the proceeds interpled to the court (the claim in interpleader) and dismissed that portion, with leave to file in the Chancery Court, which it found to be the proper forum for adjudication of that issue.
The circuit court tried the portion of the case dealing with the claim for additional living expenses on January 12, 1990, whereupon the jury returned a verdict for U.S.A.A. From that verdict and judgment entered, Theresa and Larry Necaise have appealed and present eleven issues for consideration by the Court.
Theresa and Larry Necaise filed a complaint in the Chancery Court of Pearl River County on December 7, 1989, and sought a declaratory judgment pursuant to M.R.C.P. 57 that they alone were entitled to the insurance proceeds. Pamela Necaise Nuccio never filed a formal answer. The parties entered into a stipulation of facts on August 24, 1990, in accordance with the undisputed facts brought out at the prior trial and set out below.
Theresa and Larry filed a motion for summary judgment on October 5, 1990, which was opposed by Pamela and briefed by both parties. On December 19, 1990, the chancery court entered an "ORDER OVERRULING SUMMARY JUDGMENT" and holding that Pamela Necaise Nuccio was entitled to one-half of the proceeds of the policy for dwelling loss. Larry and Theresa also appealed this judgment and present three issues for consideration by the Court.
The issues on this consolidated appeal are condensed and reformed into two issues for discussion. Any issue not discussed is rejected as being without merit.

FACTS
At the time of their divorce on May 27, 1982, Larry J. Necaise and Pamela Necaise Nuccio were the owners in joint tenancy of a home in Pearl River County, Mississippi. The decree granted the divorce to Pamela Necaise on the ground of habitual cruel and inhuman treatment, gave her custody of the couple's two minor children and awarded her $200 per month for support and maintenance *255 of the children. No provision was made concerning the marital home.
Larry continued to live in the house and Pamela and the children moved elsewhere. Larry remarried in February, 1986, to Theresa M. Necaise, and they resided together in the house, which was still owned by Larry and Pamela. In February of 1988, Theresa applied for, and was issued, a homeowners insurance policy by U.S.A.A. Insurance Company. Larry and Theresa claimed, and U.S.A.A. did not dispute, that Theresa alone paid the $679 premium to obtain the policy. Theresa testified that she bought the policy because her husband could not get insurance on the property and to protect herself. The "policy declarations" listed Larry J. Necaise as the "named insured." The policy provided $50,000 coverage for dwelling loss, $5,000 for loss of other structures, $25,000 for personal property loss, $10,000 for loss of use, $100,000 for personal liability and $1,000 medical payments loss.
Fire totally destroyed the house on September 9, 1988, during the policy period. U.S.A.A. hired Phillips and Associates, an independent adjusting firm, to adjust the loss. Phillips sent H.C. Booth to do the job. The company issued its first payment, a $5,000 advance, to Larry J. Necaise on September 23, 1988. The check listed Theresa Necaise as the "insured."
On September 29, 1988, U.S.A.A. issued a second check in the amount of $10,804.60, payable to the order of Larry J. Necaise and the Farmer's Home Administration, to pay off the deed of trust on the property. Theresa M. Necaise was shown on the check as the "policy holder." Another payment of $24,019 was made on October 17, 1988, this time payable to the order of Larry J. and Theresa Necaise. This check, purportedly, was in payment for loss of contents (personal property) and additional living expenses. The amount was arrived at after deducting the $5,000 advance payment.
On October 10, 1988, Theresa filed a "Proof of Loss" on the dwelling portion of the coverage. She listed the actual cash value of the house at $80,508.60 and claimed she was entitled to the full $50,000 limit for dwelling loss. U.S.A.A. issued a second check dated October 17, 1988, in the amount of $41,033.40, for dwelling loss and debris removal costs less prior payments. However, this check was marked "pay to the order of" Theresa M. Necaise, Larry J. Necaise and Pamela Necaise. Booth, the company's designated representative, testified that the company had no choice about how to issue the check; since Pamela owned an interest in the property she had to be listed on the check.
Theresa and Larry rejected the check and returned it to Booth. Theresa testified that they never attempted to secure Pamela's endorsement on the check or even told her that they had a check.
The policy provision concerning payment of the proceeds reads:
10. Loss Payment. We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:
a. reach agreement with you; or
b. there is an entry of a final judgment; or
c. there is a filing of an appraisal award with us.
Even though Larry and Theresa received $4,019 from U.S.A.A. in settlement of their living expenses, once U.S.A.A. refused to issue a check in their names only, they claimed they were entitled to additional living expenses, since this action by the company kept them from building a new house where they would be permanently established. This was the sole issue tried in the circuit court and decided by the jury.
Theresa testified that she and Larry were unable to obtain financing to build a new home immediately after U.S.A.A. refused to pay them. They finally began building a new home at a different location in November of 1988. However, they ran out of money and had to postpone their efforts for some time. At the time of the trial on January 12, 1990, Theresa testified, they were again in the process of building and contemplated finishing their new house in about two more *256 months. They were able to finish the house by obtaining a temporary loan of $25,000 in September of 1989.
Theresa and Larry submitted a list of the additional living expenses they claimed under the policy. The principal item of expense was rent on a house, which totalled $6,400 at $400 per month. Also included as additional living expenses were such items as "blue-prints to rebuild" ($130), "electric service to building site" ($537.44), "renters insurance" ($255.80), gasoline ($1,825.80), water ($37.50), "P.O. Box charge ($28), "Bldg Permit" ($47.10), "Phone calls to Wiggins" ($20.25) and meals for the months of September and October of 1988 ($1,500). Booth testified that the blueprints and electricity charges were not "additional living expense" under the policy, but instead were part of the costs of rebuilding. The renters insurance, mailbox charge and gasoline were likewise not covered under the additional living expense portion of the policy, according to Booth. The expense for meals would seem to be included as part of the payment of $4,019 given to Theresa and Larry.

DISCUSSION

I. WHETHER THE LOWER COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT ON THE GROUNDS THAT U.S.A.A. ACTED PROPERLY IN PLACING PAMELA NECAISE NUCCIO'S NAME ON THE CHECK.
This issue is the crux of this entire appeal. Theresa and Larry's claim for punitive damages and the additional living expenses they claimed arose from the alleged wrongful failure to pay them alone the dwelling loss claim. The circuit court granted U.S.A.A.'s motion for summary judgment, and found U.S.A.A.'s actions in this regard proper. It then severed and dismissed the portion of the suit dealing with the proper disposition of the interpled funds.
As purely a matter of law, this Court's review of this issue is de novo. Stevenson v. Stevenson, 579 So.2d 550, 552-53 (Miss. 1991); Planters Bank and Trust Co. v. Sklar, 555 So.2d 1024, 1028 (Miss. 1990).
The question at issue has never been considered in Mississippi in the context of a suit between the insured and the insurer. However, this Court has considered the question of the division of proceeds of an insurance contract taken out by one co-tenant in a suit among the co-tenants. In Sullivan v. Estate of Eason, 558 So.2d 830 (Miss. 1990), the Court dealt with five children who had inherited their parent's house by intestate succession. One of the children insured her interest for the full value of the house before it burned down, then sought to keep the entire proceeds of the policy. Notably, the company in that case also placed all five heirs' names on the check. Testimony indicated that some money from one of the parent's estate had been used to purchase the insurance and that the insuring co-tenant had represented to the others that the insurance was for the benefit of all the co-tenants. The chancellor held that the insurance had been procured for the benefit of all and ordered the proceeds so divided. Id. at 832.
On appeal, this Court considered two distinct bodies of thought on the question of whether the other co-tenants were entitled to share in the proceeds of the policy. One line of cases "holds that insurance is a personal contract of indemnity to protect the insured," and that the co-tenants are not entitled to share in the proceeds of the policy. Id. at 833. The other line of cases holds that "one securing insurance for the benefit of the other insurable interests in property holds the proceeds in trust for those interests." Id. at 833. The Court then adopted the following analysis from an Alabama case, to be applied to the facts of each case:
Among the inquiries the supreme court considered relevant to a determination of whether the circumstances warranted a holding that the insurance proceeds be shared are: (1) whether the insurance was obtained for the sole benefit of the person who procured it; (2) whether by express or implied agreement the person who took out the insurance did so for the benefit of the owners of the other interests in the property; and (3) whether the owners of the other interests contributed to the cost of the insurance. The supreme court concluded *257 by stating that these questions were to be determined from the evidence presented at trial and the circumstances of the parties.
Summerlin v. Bowden, 353 So.2d 1175, 1179 (Ala. Civ. App. 1978) (quoted in Sullivan, 558 So.2d at 844).
Application of the three factors adopted by this Court in Sullivan compels us to hold that the lower court erred in finding that U.S.A.A. properly placed Pamela Nuccio's name on the check for the dwelling loss. None of the factors favor Pamela's and U.S.A.A.'s position. First, the insurance was taken out by Theresa for her own and Larry's benefit, not for Pamela's. By taking insurance in the amount of $50,000 on a house worth approximately $80,000, Theresa seemingly attempted to insure only her own and Larry's interest in the home, not the entire value. Secondly, the record is absolutely devoid of evidence that any express or implied agreement existed between Theresa and/or Larry and Pamela. Indeed, it would be absurd to assume or imply such an agreement among a husband, his present wife and his ex-wife. Thirdly, Theresa purchased the insurance with her own funds. Pamela did not pay any of the costs of the insurance. To allow her to collect on this policy would be to grant her an absolute windfall.
Further, whether Theresa and Larry had a duty to share the proceeds with Pamela is of no consequence to U.S.A.A. If such a duty existed, it would be a matter among those three parties, not between U.S.A.A. and its policy holder(s). Theresa contracted for the insurance for her own and Larry's benefit, and it is only to those two parties that U.S.A.A. owes the obligation to pay benefits. If Pamela Nuccio, or any other stranger to an insurance contract, wishes to claim a portion of the benefits under a policy issued to another, it is incumbent upon her to stake her claim, not on the insurance company. The company's duty is to pay benefits to the party with whom it contracted. Although the case dealt with the relationship between a life tenant and remaindermen, we think that Estate of Murrell v. Quin, 454 So.2d 437 (Miss. 1984) states the correct rule. "This Court is committed to the doctrine that fire insurance is an indemnity to the insured and the proceeds thereof do not run with the land." Id. at 439 (quoting King v. King, 163 Miss. 584, 595, 143 So. 422, 424 (1932). Instruction D-4, stating the contrary, was therefore granted in error.
From the foregoing analysis, we are of the opinion that both lower courts erred in their judgments.
The chancery court ruled that:
Pamela Necaise Nuccio was also a co-owner of the property whose interest was being held in trust for her by Larry, by virtue of his occupancy thereof, as a result of their prior divorce and her subsequent acquiescence in that continued use and occupancy by him. Therefore, the Court finds that the proceeds of $41,033.40 which has been interpled into the Court by the insurance company should belong one-half (1/2) to Larry and Theresa Necaise, and one-half (1/2) to Pamela Necaise Nuccio, with all previously paid sums for loss of content coverage to be retained in full by Larry and Theresa Necaise.
Pamela Necaise Nuccio, appellee in case number 91-CA-43, states in her brief that Shepherd v. Shepherd, 336 So.2d 497 (Miss. 1976) is, "[d]ispositive of the issue concerning the state of the title," as if that is at issue in the case. All parties agree that the title to the property at issue in the case sub judice is held by Larry Necaise and Pamela Necaise Nuccio as joint tenants with full rights of survivorship. Nuccio then argues that "[u]nder Mississippi law, the purchaser of an insurance policy must have an insurable interest in the property or life insured for the purchaser to be entitled to proceeds from the policy. Aetna Casualty & Surety Co. v. Davidson, 715 F. Supp. 775, 776 (N.D.Miss. 1989)." Theresa, Pamela argues, had no insurable interest and therefore no right to the proceeds. She then concludes that she is entitled to share the proceeds with Larry merely because she is a joint tenant with him, adding no citation of authority to support her claim.
"[A]n insurable interest must exist in an insured when the contract is entered for it to be effective." Mississippi Farm Bureau *258 Mut. Ins. Co. v. Todd, 492 So.2d 919, 931 (Miss. 1986) (citing Southeastern Fidelity Ins. Co. v. Gann, 340 So.2d 429 (Miss. 1976). All that is required for one to have an insurable interest in property is that the insured will suffer an economic loss if the property is destroyed. Gann, 340 So.2d at 433-34, (Miss. 1976); Liverpool & London & Globe Ins. Co. v. Delaney, 190 Miss. 404, 200 So. 440 (1941). Further, once the insurable interest requirement is met, "the insurer is liable under the valued policy law for the amount named in the policy, regardless of the extent of the insurable interest." Todd, 492 So.2d at 932 (citing Hartford Fire Ins. Co. v. Clark, 154 Miss. 418, 429-31, 122 So. 551, 553-54 (1929)); Miss. Code Ann. § 83-13-5 (1972).
Insurers in this state do not seem to understand this concept. The policy of this state, embodied in the above case law, frowns upon insurers who sell insurance and then claim, upon a loss, that the insured has no insurable interest or less than that reflected by the policy limits. Clearly, Theresa had an insurable interest in the property by virtue of her homestead rights. The destruction of the property unquestionably caused her economic loss, e.g., moving expenses and the expense of finding other housing. Quite simply, she had a place to live before the fire, afterwards she had none. Had she chosen to, she could have named herself as the "named insured" and collected all of the proceeds herself. Under the law, she and Larry are entitled to all of the proceeds of the policy. The chancellor erred in ruling that Pamela was entitled to any of the proceeds.

II. WHETHER THE CIRCUIT COURT ERRED IN SEVERING THE PORTION OF THE SUIT DEALING WITH DWELLING LOSS?
After the circuit court's erroneous ruling on the propriety of U.S.A.A.'s actions, the case proceeded to trial on the only remaining claim, i.e., that the company had not paid all of the benefits due under the portion of the policy providing benefits for added living expenses arising from the destruction of the property.
The court may order severance of separate claims, and may do so upon its own motion. Miss.R.Civ.P. 42(b). The decision to sever rests within the sound discretion of the trial judge. Id.
However, the circuit court's decision to sever the claims in this case rests upon its erroneous decision on a matter of law, i.e., the propriety of U.S.A.A.'s decision to place Pamela Nuccio's name on the proceeds check. The lower court abused its discretion in this case. The claims for the proceeds of the policy under the dwelling loss and living expenses clauses were highly intertwined. In fact, the living expenses claim actually depended on the jury first finding that the expenses claimed resulted from U.S.A.A.'s failure to tender payment to Theresa and Larry, thus causing them to incur the extra expenses. This is borne out by the record, which shows that the circumstances surrounding the tender of the check in all three names was brought out in spite of the severance.
The circuit court erred both in its determination that the company acted properly in placing Pamela Nuccio's name on the proceeds check and in severing the portion of the claim dealing with the additional living expenses. The chancellor then erred on the same question concerning Nuccio's entitlement to the proceeds. Cause number 90-CA-0141 is remanded to the circuit court for a new trial in which the circumstances surrounding the the erroneous decision to place Nuccio's name on the check may be fully developed before the jury. Chancery Court cause number 91-CA-0043 is reversed and judgment is rendered here in favor of Theresa and Larry Necaise.
CASE NO. 90-CA-0141: REVERSED AND REMANDED TO THE CIRCUIT COURT.
CASE NO. 91-CA-0043: REVERSED AND RENDERED.
HAWKINS, P.J., PRATHER, SULLIVAN and McRAE, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion joined by PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ.
*259 DAN M. LEE, Presiding Justice, dissenting:
I am unable to join in the decision of the majority, therefore I write separately to respectfully express my dissent. As the majority correctly states, the crux of this matter is whether the Circuit Court erred in granting the motion for summary judgment brought by U.S.A.A. The majority concludes that it did and reverses on that ground. Apparently the majority has trouble separating the issue of which party is entitled to the proceeds from the issue of whether the insurance company acted in bad faith. Although it is extremely close on the facts of this case, I do believe the majority reached the proper result on the ultimate distribution of the insurance benefit.
However, I strongly disagree on the issue of whether the summary judgment was granted in error. While it is acceptable to say that the ultimate distribution of proceeds is governed by the three prong test quoted from Summerlin v. Bowden, 353 So.2d 1175 (Ala. Civ. App. 1978), it is wholly unreasonable to expect an insurer to be able to apply this test without the benefit of judicial power and under peril of double payment. It stretches the outer limits of the legal concept of bad faith to find that it could exist in a situation where full payment is tendered. To further find that it could exist here where the co-owner has an arguable claim to the proceeds under existing case law is inconceivable.
I am firmly convinced that an insurer who tenders full payment to record co-owners, under circumstances where the joint payees will likely be forced to litigate to determine their respective rights, cannot be said to have wrongfully refused to pay. Accordingly I would affirm the summary judgment of the lower court in favor of U.S.A.A.
PITTMAN, BANKS and ROBERTS, JJ., join this opinion.

ON PETITION FOR REHEARING

[Filed October 27, 1994]
BANKS, Justice, for the Court:
We deny this petition for rehearing. We add a few words of explanation of our reversal of the circuit court's summary judgment in favor of U.S.A.A. on the Necaises' claim for extra-contractual and punitive damages.
At first blush, it seems reasonable that an insurance company would be justified in issuing a check jointly to competing claimants, where it would otherwise expose itself to liability for paying the wrong party. In the present circumstances, however, we cannot find within our precedents, nor those of any other jurisdiction, any reasonable basis for U.S.A.A. fearing liability to Pamela Necaise Nuccio.
U.S.A.A. does not cite a single authority for its fear or its action. We have found only two cases with any similarity. In one, the insurance company issued a check to the insured and the record mortgagee. The insured's lawyer wrote the carrier informing it that the mortgagee had not required the insurance. The carrier immediately reissued the check to the insured. In an action brought by the mortgagee against the insurance carrier, the court found for the carrier. U.S. v. Aid Ins. Co. 642 F. Supp. 535 (E.D.Mo. 1986). The other was a Louisiana case Smith v. United Fire Insurance Co., 303 So.2d 286 (La. App. 1973), where the court found no liability on the part of the carrier to another with an interest in the property where the carrier paid its insured. That court ventured that the carrier would have been at risk paying anyone else.
The chancellor's holding that Pamela was entitled to share in these proceeds is wholly without foundation in the law as demonstrated by the original majority opinion. The absence of any arguable basis for that decision vitiates any support that it may lend to the question whether U.S.A.A. had an arguable reason to act as it did. Moreover, even if the chancellor did have some arguable reason to support his view, the issue was one between Pamela and Thomas and not Pamela and U.S.A.A.
The policy that states "[e]ven if more than one person has an insurable interest in the property covered, we shall not be liable ... to the [i]nsured for an amount greater than the [i]nsured's interest ... nor for more than the applicable limit of liability." U.S.A.A had no rational justification based on the contract *260 or in law for its concern of possible litigation by Pamela. Its own policy is in conflict with its testimony that it had no choice about how to issue the check.
U.S.A.A. simply had no legal exposure to Pamela. That is not to say that it deserves to suffer extra-contractual or punitive damages, but it is to say that issue cannot be decided summarily. U.S.A.A owed the Necaises a duty to perform its part of the indemnification contract, but instead asserted an unjustifiable claim of a third party. U.S.A.A issued the check at a time when it knew or should have known that a check made out to a wife, a husband and his ex-wife would be problematical. As a result of its actions, Larry and Theresa allege extra-contractual damages including, litigation expenses and attorney's fees.
In Travelers Indemnity Co. v. Wetherbee, 368 So.2d 829, 835 (Miss. 1979), this Court held that a punitive damages award was correctly granted where admittedly due coverage was not paid for eight unexplained months, even after the insurer was notified of the insurers' economical suffering. The insurance company in Wetherbee paid into court six thousand dollars' worth of contents loss some eight months later, after the destruction occurred, because it was company policy not to settle one claim without the settlement of all other claims. We held that the tendering of that into court eight months later was an act of bad faith. In Valley Forge Ins./CNA v. Strickland, 620 So.2d 535, 540 (Miss. 1993) we held that punitive damages were justified where an insurer instigated meritless subrogation claim. Finally, Universal Life Ins. Co. v. Veasley, 610 So.2d 290, 295 (Miss. 1992) we held that even where the failure to pay does not rise to a level allowing the imposition of punitive damages, the carrier may be liable for extra-contractual damages for an unjustified failure to pay.
The circuit court award of summary judgment to U.S.A.A was based solely on the erroneous view that the carrier had some justification for encumbering the proceeds of the policy. That summary judgment was properly reversed by the original opinion of this court and the matter remanded to the circuit court for further proceedings at which the propriety of damages, punitive or otherwise, can be given full exposition.
PETITION FOR REHEARING DENIED.
PRATHER, P.J., and SULLIVAN, McRAE and SMITH, JJ., concur.
HAWKINS, C.J., dissents with separate written opinion, joined by DAN M. LEE, P.J., and PITTMAN, J.
DAN M. LEE, P.J., dissents with separate written opinion joined by HAWKINS, C.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ.

[Filed October 27, 1994]
HAWKINS, Chief Justice, dissenting:
I join Justice Lee's cogent dissent.
Punitive damages cannot be divorced from the human character. Where in this case was there a hint that the insurance carrier was motivated by greed, bad faith or an intent to harass any claimant? Or reckless or calloused indifference or disregard of the insureds' rights? Nowhere.
DAN M. LEE, P.J., and PITTMAN, J., join this opinion.

[Filed October 27, 1994]
DAN M. LEE, Presiding Justice, dissenting:
For the reasons set out below, and in my original dissent in this case, I would grant the petition for rehearing and affirm the summary judgment in favor of U.S.A.A. as to punitive damages only. The facts relevant to this appeal are not in dispute. Therefore, the following procedural history and factual background are taken almost verbatim from the majority opinion of former Chief Justice Roy Noble Lee. I include them here rather than incorporating them by reference in an effort to make this opinion complete and meaningful standing alone.
Theresa M. and Larry J. Necaise filed their complaint to begin this suit on October 3, 1988, seeking contractual and punitive damages arising out of an insurance contract entered into with United States Automotive *261 Association Casualty Co. (U.S.A.A.). More specifically, the complaint alleged that U.S.A.A. had breached its duty of good faith and fair dealing in: (1) refusing to pay benefits under a policy of insurance; (2) withholding payment willfully and in bad faith and (3) contrary to the express provisions of the policy. U.S.A.A.'s answer, filed February 23, 1989, stated a counterclaim in interpleader against Pamela Necaise Nuccio and U.S.A.A. deposited $41,033.40, the amount of insurance proceeds in dispute, with the court clerk.
Thereafter, on May 1, 1989, an agreed order was entered joining Pamela Necaise Nuccio as a party to the suit. Nuccio filed a "Motion for Claim and Entry" on July 2, 1989, requesting that she be awarded one-half of the interpled proceeds, since she was the record title owner of a one-half interest in the destroyed property. U.S.A.A. filed a motion for summary judgment on September 15, 1989, which the court granted as to the portion of the policy dealing with dwelling loss and punitive damages, leaving only the claim for further living expenses. The order also severed the portion of the case dealing with the proper distribution of the proceeds interpled to the court (the claim in interpleader) and dismissed that portion, with leave to file in the Chancery Court, which it found to be the proper forum for adjudication of that issue.
The circuit court tried the portion of the case dealing with the claim for additional living expenses on January 12, 1990, whereupon the jury returned a verdict for U.S.A.A. From that verdict and judgment entered, Theresa and Larry Necaise have appealed.
Theresa and Larry Necaise filed a complaint in the Chancery Court of Pearl River County on December 7, 1989, and sought a declaratory judgment pursuant to M.R.C.P. 57 that they alone were entitled to the insurance proceeds. Pamela Necaise Nuccio never filed a formal answer. The parties entered into a stipulation of facts on August 24, 1990, in accordance with the undisputed facts brought out at the prior trial and set out below.
Theresa and Larry filed a motion for summary judgment on October 5, 1990, which was opposed by Pamela and briefed by both parties. On December 19, 1990, the chancery court entered an "ORDER OVERRULING SUMMARY JUDGMENT" and holding that Pamela Necaise Nuccio was entitled to one-half of the proceeds of the policy for dwelling loss. Larry and Theresa also appealed this judgment.
Today, I write to dissent to the denial of the petition for rehearing. Like the majority, I would hold that Larry and Theresa Necaise are entitled to all the proceeds of the policy issued by U.S.A.A. However, as to the punitive damage aspect of this case where the insurer, who tendered full payment to record co-owners and interpled the full proceeds into court, did not amount to bad faith refusal to pay under the facts of this case.

FACTS
At the time of their divorce on May 27, 1982, Larry J. Necaise and Pamela Necaise Nuccio were the owners in joint tenancy of a home in Pearl River County, Mississippi. The decree granted the divorce to Pamela Necaise on the ground of habitual cruel and inhuman treatment, gave her custody of the couple's two minor children and awarded her $200 per month for support and maintenance of the children. No provision was made concerning the marital home.
Larry continued to live in the house and Pamela and the children moved elsewhere. Larry remarried in February, 1986, to Theresa M. Necaise, and they resided together in the house, which was still owned solely by Larry and Pamela. In February of 1988, Theresa applied for, and was issued, a homeowners insurance policy by U.S.A.A. Insurance Company even though Theresa was not a record title owner of the dwelling. Larry and Theresa claimed, and U.S.A.A. did not dispute, that Theresa alone paid the $679 premium to obtain the policy. Theresa testified that she bought the policy because her husband could not get insurance on the property and to protect herself. The "policy declarations" listed Larry J. Necaise as the "named insured." The policy provided $50,000 coverage for dwelling loss, $5,000 for loss *262 of other structures, $25,000 for personal property loss, $10,000 for loss of use, $100,000 for personal liability and $1,000 medical payments loss.
Fire totally destroyed the house on September 9, 1988, during the policy period. U.S.A.A. hired Phillips and Associates, an independent adjusting firm, to adjust the loss. Phillips sent H.C. Booth to do the job. The company issued its first payment, a $5,000 advance, to Larry J. Necaise on September 23, 1988. The check listed Theresa Necaise as the "insured."
On September 29, 1988, U.S.A.A. issued a second check in the amount of $10,804.60, payable to the order of Larry J. Necaise and the Farmer's Home Administration, to pay off the deed of trust of Larry and Pam Necaise on the property. Theresa M. Necaise was shown on the check as the "policy holder." Another payment of $24,019 was made on October 17, 1988, this time payable to the order of Larry J. and Theresa Necaise. This check, purportedly, was in payment for loss of contents (personal property) and additional living expenses. The amount was arrived at after deducting the $5,000 advance payment.
On October 10, 1988, Theresa filed a "Proof of Loss" on the dwelling portion of the coverage. She listed the actual cash value of the house at $80,508.60 and claimed she was entitled to the full $50,000 limit for dwelling loss. U.S.A.A. issued a second check dated October 17, 1988, in the amount of $41,033.40, for dwelling loss and debris removal costs less prior payments. However, this check was marked "pay to the order of" Theresa M. Necaise, Larry J. Necaise and Pamela Necaise. Booth, the company's designated representative, testified that the company had no choice about how to issue the check; since Pamela owned a 1/2 recorded title interest in the property she had to be listed on the check.
Theresa and Larry rejected the check and returned it to Booth. Theresa testified that they never attempted to secure Pamela's endorsement on the check or even told her that they had a check.
The policy provision concerning payment of the proceeds reads:
10. Loss Payment. We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:
a. reach agreement with you; or
b. there is an entry of a final judgment; or
c. there is a filing of an appraisal award with us.
Even though Larry and Theresa received $4,019 from U.S.A.A. in settlement of their living expenses, once U.S.A.A. refused to issue a check in their names only, they claimed they were entitled to additional living expenses, since this action by the company kept them from building a new house where they would be permanently established. This was the sole issue tried in the circuit court and decided in favor of U.S.A.A. and against Larry and Theresa Necaise by the jury.

DISCUSSION

WHETHER THE CIRCUIT COURT ERRED IN GRANTING U.S.A.A.'S MOTION FOR SUMMARY JUDGMENT.
Theresa and Larry's claim for punitive damages and the additional living expenses they claimed arose from the alleged wrongful failure to pay them alone the dwelling loss claim. The circuit court granted U.S.A.A.'s motion for partial summary judgment, and found U.S.A.A.'s actions in this regard not to constitute bad faith refusal to pay. We agree, under the facts of this case, there was no bad faith refusal to pay.
The reasoning behind this position is straightforward. Our case law now recognizes a three factor test for determining whether insurance proceeds should be shared. See Sullivan v. Estate of Eason, 558 So.2d 830 (Miss. 1990). This inquiry is fact-intensive and takes into account such subjective factors as the intent of the insurance procurer and the existence of implied agreements between co-owners. No matter who is paid under these circumstances, there is always the risk that a court with access to *263 more evidence will allocate the proceeds differently. All that we should require under these circumstances is payment and an arguable basis for the selection of payees. Obviously payment to a remote, unrelated party could amount to a bad faith refusal to pay. However, payment in reliance on objective factors such as the ownership interests reflected on the deed to the property, although subject to ultimately being proven to be an incorrect allocation, cannot be said to be a "bad faith refusal" to pay. Accordingly, the lower court's summary judgment on this issue was proper and should be affirmed.
HAWKINS, C.J., PITTMAN and JAMES L. ROBERTS, Jr., JJ., join this opinion.